**CITY OF PHILADELPHIA, Plaintiff,**

v.

**STEPAN CHEMICAL COMPANY, et al., Defendants.**

Civ. A. No. 81–851.

United States District Court,
E. D. Pennsylvania.

Aug. 4, 1982.

Frank M. Thomas, Jr., Deputy City Sol., Philadelphia, Pa., for plaintiff.

Bertram A. Stone, Stone, Pogrund & Korey, Chicago, Ill., for defendant Apollo Metals, Inc.

Mark D. Turetsky, Miller & Turetsky, Norristown, Pa., for defendant Armstrong Corp.

Andrew N. Grass, Jr., Todd B. Sollis, Windels, Marx, Davies & Ives, New York City, for defendant Atlas Minerals & Chemicals, Inc.

Joseph F. Van Horn, Swartz, Campbell & Detweiler, Philadelphia, Pa., for defendant Bank of Delaware.

Steven T. Stern, Braemer & Kessler, Philadelphia, Pa., for defendant Brind Leasing Co.

John R. Howland, Howland, Hess & Guinan, Huntingdon Valley, Pa., for defendant Chapman Industrial Finishes, Inc.

Patrick T. Ryan, J. Freedley Hunsicker, Jr., Cynthia J. Giles, Drinker, Biddle & Reath, Philadelphia, Pa., for defendants Congoleum Corp., UMC Industries, Inc. and Zallea Brother, Inc.

Denis V. Brenan, Richard F. McMeniman, Morgan, Lewis & Bockius, Philadelphia, Pa., for defendants Allied Aviation Service Co., J. L. Clark Mfg. Co., Sonoco Products Co., U. S. Gypsum Co. and Durabond Products Co.

Michael L. Rodburg, Murry D. Brochin, Roseland, N. J., for defendant CPS Chemical Co.

Richard C. Rizzo, Bradford F. Whitman, Dechert, Price & Rhoads, Philadelphia, Pa., for defendant Delmarva Power & Light Co.

Henry P. Stonelake, Philadelphia, Pa., for defendant Diversified Printing Corp.

Albert L. Bricklin, Bennett, Bricklin, Saltzburg & Fullem, Philadelphia, Pa., for Grow Group, Inc.

Ronald I. Rosen, Michael Borish, Tabas & Furlong, Philadelphia, Pa., for defendant Pennex Products Co.

Clayton H. Thomas, Jr., Philadelphia, Pa., for defendant Precision Tube Co.

Leonard J. Lefkort, Gilbert & Gilbert, New York City, for defendant Radiac Research Corp.

Michael H. Malin, Jerrold P. Anders, White & Williams, Philadelphia, Pa., for defendants Radiac Research Corp., Delaware County Regional Water, Control Authority (Delcora) and Gates Engineering Co.

John P. McKelligott, Harvey, Pennington, Herting & Renneisen, Philadelphia, Pa., for defendant Reading Industries, Inc.

Thomas P. Grace, LaBrum & Doak, Philadelphia, Pa., for defendants Seton Co. and Wilmington Chemical Corp.

James W. Gladden, Jr., Priscilla Weaver, Mayer, Brown & Platt, Chicago, Ill., for defendant Stepan Chemical Co.

David Richman, John A. Guernsey, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendants Sun Chemical Corp. and CPS Chemical Co.

Donald K. Joseph, Marc E. Gold, Barry M. Klayman, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for defendants Sybron Corp. and Ionac Chemical Co.

Henry H. Janssen, Warren L. Simpson, Jr., Rawle & Henderson, Philadelphia, Pa., for defendants Thomas & Betts Corp. and T&B/Ansley Corp.

John W. Morris, Pierson, Cameron & Morris, P. C., Philadelphia, Pa., for defendant Wright Const. Co.

## OPINION

DITTER, District Judge.

In this action, the City of Philadelphia ("the City") seeks to recover clean-up costs and consequential damages which resulted from the illegal dumping on city property of industrial waste generated by the defendants. The suit is predicated upon numerous federal and state environmental statutes as well as several common law theories of recovery. Defendants have filed a comprehensive motion for judgment on the pleadings under Fed.R.Civ.P. 12(c) asserting that the statutes upon which the City relies do not support its claim and that, as a matter of law, they cannot be held liable on any of the common law causes of action. For the reasons that follow, the motion will be granted in part and denied in part.

█ "In considering a motion for judgment on the pleadings, the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Chuy v. National Football League Players' Association*, 495 F.Supp. 137, 138 (E.D.Pa.1980), *quoting* 5 C. Wright and A. Miller, Federal Practice and Procedure § 1368, at 690 (1969). A review of the pleadings in light of this standard reveals the following factual setting. Defendants are a number of concerns which generate industrial waste as a byproduct of their operations. At various times, each defendant contracted with either Lightman Drum Company ("Lightman") or ABM Disposal Service Company ("ABM") to haul and dispose of the waste. During 1974 and 1975, ABM and Lightman illegally dumped the waste at a landfill on Enterprise Avenue in Southwest Philadelphia ("the Enterprise site") which was owned by the City and intended for use only by the City. Access to the Enterprise site was gained by bribing two City employees. The existence of substantial quantities of waste on the Enterprise site was discovered by City officials in 1979. Criminal convictions were obtained against the employees who accepted the bribes and against Lightman and its president, Jerome Lightman. Charges are pending against the president of ABM, Ellis Barnhouse, who is presently a fugitive.[1]

The City alleges that as a result of this illegal dumping, the soil at the Enterprise site has been contaminated and the adjacent Delaware River and groundwater underlying the site have been polluted. This has obligated the City to commence a comprehensive clean up program having an estimated cost of $10 million. In addition, a sewage sludge recycling center which is scheduled to be built on the Enterprise site has been postponed indefinitely, a delay which will increase construction costs by about $20 million. The City filed a nine-count complaint seeking to recover $30 million in damages as well as civil penalties. The complaint sets forth the following claims for relief: (1) liability under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 *et seq.* (CERCLA); (2) the citizen suit provision of the Clean Water Act, 33 U.S.C. § 1365(a); (3) the federal common law of nuisance; (4) common law strict

---

1. The City has commenced separate actions against both Lightman and ABM. *See City of Philadelphia v. Lightman Drum Co. et al.*, C.A. No. 80–2004; *City of Philadelphia v. Barnhouse et al.*, C.A. No. 80–4464. In addition, at least one defendant has joined Lightman and ABM as third-party defendants in this matter.

liability; (5) the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.101 *et seq.* (the SWMA); (6) the Pennsylvania Clean Streams Law, 35 P.S. § 691.1 *et seq.* (7) common law trespass and nuisance; (8) common law negligence; and (9) various provisions of the Philadelphia Code. Jurisdiction is based upon 28 U.S.C. § 1331, 42 U.S.C. § 9613(b) (granting federal courts "exclusive, original jurisdiction" of all controversies arising under CERCLA), and 33 U.S.C. § 1365(a) (granting federal courts jurisdiction over Clean Water Act actions). Jurisdiction over the state claims is pendent.

**2.** 42 U.S.C. § 9607(a) provides as follows:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities or sites selected by such person,

from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; and

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release.

**3.** "Hazardous substances" are defined in the Act as (a) a substance designated as hazardous under 33 U.S.C. § 1321(b)(2)(A); (b) any "element, compound, mixture, solution, or substance" designated as hazardous by the admin-

## COUNT I COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT

■ The City's CERCLA claim is predicated upon the statute's liability provision, 42 U.S.C. § 9607(a).[2] That provision designates three categories of "responsible persons." They are (1) present and former owners of hazardous substances disposal sites; (2) transporters of hazardous substances, and (3) those who arrange for the transport or disposal of hazardous substances (normally generators).[3] These responsible persons are liable[4] for three types of costs which are incurred as the result of

istrator of the Environmental Protection Agency (EPA) pursuant to the authority granted under 42 U.S.C. § 9602; (c) any substance having the characteristics identified under 42 U.S.C. § 6921; (d) any toxic pollutant listed under 33 U.S.C. § 1317(a); (e) any hazardous air pollutant listed under 42 U.S.C. § 7412; (f) any "imminently hazardous chemical substance or mixture" with respect to which the EPA has taken action pursuant to 15 U.S.C. § 2606. *See* 42 U.S.C. § 9601(14).

**4.** The statute does not specify under what circumstances liability will be imposed upon "responsible persons." Rather, it incorporates the standard of liability set forth in section 311 of the Clean Water Act, 33 U.S.C. § 1321. *See* 42 U.S.C. § 9601(32). Section 311 has been construed as imposing strict liability upon certain designated parties, subject only to defenses specifically enumerated in the statute. *See United States v. LeBeouf Brothers Towing Co.,* 621 F.2d 787, 789 (5th Cir. 1980), *cert. denied,* 452 U.S. 906, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981); *Steuart Transportation Co. v. Allied Towing Corp.,* 596 F.2d 609, 613 (4th Cir. 1979); *Burgess v. M/V Tamano,* 564 F.2d 964, 982 (1st Cir. 1977), *cert. denied,* 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978). The legislative history clearly establishes Congress' understanding that it was incorporating a standard of strict liability into CERCLA. *See,* e.g., 126 Cong.Rec. S14964 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph) ("[w]e have kept strict liability in the compromise, specifying the standard of liability under section 311 of the Clean Water Act ..."); 126 Cong.Rec. H11787 (daily ed. Dec. 3, 1980) (remarks of Rep. Florio) ("[t]he standard of liability in these amendments is intended to be the same as that provided in section 311 of the [Clean Water Act]; that is, strict liability.")

a release or threatened release [5] of the hazardous substances: (1) governmental response costs, (2) private response costs incurred "by any other person" consistent with the national contingency plan,[6] and (3) damage to natural resources. It can readily be seen that the three categories of "responsible persons" set forth in 42 U.S.C. § 9607(a)(1)–(4) encompass all of the principal actors in this litigation—the City owns and operates the landfill, defendants generated the hazardous substances and contracted for their disposal, and ABM and Lightman acted as transporters. Thus, had the federal or state government undertaken to clean up the Enterprise site, all of these parties arguably would be liable for the cost of removal or other remedial action under 42 U.S.C. § 9607(a)(4)(A).

However, that did not occur. Instead, the City, itself possibly subject to liability for governmental response costs, undertook the clean up and now contends that defendants are liable for its "necessary costs of response" under 42 U.S.C. § 9607(a)(4)(B). It is this anomaly which gives rise to defendants' primary argument in seeking judgment on the City's CERCLA claim. They contend that the term "any other person" as used in 42 U.S.C. § 9607(a)(4)(B) does not include a party which itself is subject to liability under the act. Although the statute's language does not explicitly support this construction, defendants assert that it is the only interpretation consistent with the act's structure and with the logical functioning of its many interrelated provisions. Specifically, they point to several inconsistencies in the administration of the act's funding provisions [7] which would result if the City may bring this action. Under 42 U.S.C. § 9611(a), the president is authorized to use money in the fund for payment of necessary response costs "incurred by any other person as a result of carrying out the national contingency plan ...." Defendants contend that if the term "any other person" includes those who are subject to liability under the act, responsible persons could claim against the fund and against other responsible parties. Because the government has subrogation rights for payments made from the fund, see 42 U.S.C. § 9612(c)(1), the City's interpretation would assertedly result in a merry go round of litigation with the government suing a responsible person which in turn could sue other responsible persons which in turn could claim against the fund and so forth. Defendants also point to the claims procedure under 42 U.S.C. § 9612 as demonstrating the untenability of the City's position as a plaintiff. Under this section, a party making claim against the fund must first make demand for response costs upon known responsible persons and wait sixty days for satisfaction of the demand. If reimbursement is not forthcoming, the claimant then has the choice of obtaining payment from the fund or suing the responsible person under 42 U.S.C. § 9607(a)(4)(B). Defendants argue that Congress could not have intended to give responsible parties the same right to claim against the fund and sue other responsible persons as does a nonculpable third party.

5. "Release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment ...." 42 U.S.C. § 9601(22).

6. Under 42 U.S.C. § 9605, the President was given 180 days to devise a national contingency plan which, *inter alia*, "shall establish procedures and standards for responding to releases of hazardous substances ...." The CERCLA contingency plan was envisioned merely as a revision of the national contingency plan already promulgated pursuant to 33 U.S.C. § 1321(c). *See* 126 Cong.Rec. S14965 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph). Despite the 180 day time limit mandated in section 9605, the EPA did not issue the final plan until July 12, 1982. *See* Discussion in note 15, *infra*.

7. Possibly the most significant feature of CERCLA is its creation of a $1.8 billion fund (the "superfund") to finance clean up operations. The fund is financed through an excise tax imposed upon generators of chemical and petroleum products and upon operators of hazardous waste sites as well as from general appropriations. The purposes of the fund are to finance governmental response costs and to reimburse private parties who incur response costs.

■ Concededly, defendants' approach possesses a degree of analytic neatness. Regardless of how tidy it may be, however, I cannot ignore the end result of their logic—that the City, which did not voluntarily allow [8] the placement of the hazardous substances on its property and which sustained damages as the result of their illegal disposal, is precluded from recovering its clean-up costs from those parties who engaged in the very activities for which they can be held responsible under the act. Because such preclusion is not compelled by the language of CERCLA, by its legislative history, or by the environmental objectives which it is designed to achieve, I will reject defendants' position and deny their motion for judgment on Count I of the complaint.

Chief Justice Marshall's timeless observation that "[w]here the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived . . . ." *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805), is particularly apt here. The statute itself is vague and its legislative history indefinite. However, nothing in the language of 42 U.S.C. § 9607(a) compels the result sought by defendants. The provision merely sets forth, in general terms, three categories of "persons" entitled to recover response costs from those parties designated as liable for such costs. The first category consists of the federal and state governments which are entitled to recoup "all costs of removal or remedial action . . . not inconsistent with the national contingency plan." The provision in question, which follows immediately thereafter, permits recovery of "any other necessary costs of response incurred by any other person consistent with the national contingency plan." Under 42 U.S.C. § 9601(21) both federal and state governments are subsumed under the definition of person. In the context in which it appears, then, the term "any other person" is quite conceivably designed to refer to persons other than federal or state governments and not, as defendants argue, to persons other than those made responsible under the act. Thus, although not a model of clarity, the provision does not specifically exclude parties who may be liable for the costs of governmental action nor does its language necessarily support such a construction.

Although the legislative history does little to clarify this question, it does demonstrate that defendants' position cuts directly against CERCLA's objectives and the environmental concerns which prompted its enactment. CERCLA was originally proposed by its sponsors in both Houses as "a multi-faceted federal regulatory scheme designed to provide an independent basis for environmental claims by both government and private parties." Dore, *The Standard of Civil Liability for Hazardous Waste Disposal Activity: Some Quirks of Superfund*, 57 Notre Dame Lawyer 260, 267 (1981). What was enacted and signed into law is a severely diminished piece of compromise legislation from which a number of significant features were deleted.[9] However, it is clear from the discussions which preceded the passage of CERCLA that the statute is designed to achieve one key objective—to facilitate the prompt clean up of hazardous

---

**8.** While it is true that City employees permitted ABM and Lightman to enter upon the site and use it as a dumping ground, their actions were well outside the scope of their authority and can in no way be imputed to the City.

**9.** *See generally* Grad, *A Legislative History of the Comprehensive Environmental Response Compensation and Liability ("Superfund") Act of 1980*, 8 Columbia Journal of Environmental Law 1 (1982); Note, *Liability for Generators of Hazardous Waste: The Failure of Existing Enforcement Mechanisms*, 69 Georgetown Law Journal 1047, 1056–58 (1981). Specifically, the compromise version which ultimately was enacted deleted the imposition of "joint and several liability" upon responsible parties; deleted a federal cause of action for medical expenses and property damage as well as a liberal medical causation provision, cut the size of the superfund from $4.1 billion over six years to $1.6 billion over five years; added the third-party defense to liability set forth in 42 U.S.C. § 9607(b)(3), and created limits on liability for vessels, trucks, trains, and aircraft. *See* 126 Cong.Rec. S14964 (daily ed. Nov. 28, 1980) (remarks of Sen. Randolph); 126 Cong.Rec. S14967 (daily ed. Nov. 28, 1980) (remarks of Sen. Stafford).

dumpsites by providing a means of financing both governmental and private responses and by placing the ultimate financial burden upon those responsible for the danger. The liability provision is an integral part of the statute's method of achieving this goal for it gives a private party the right to recover its response costs from responsible third parties which it may choose to pursue rather than claiming against the fund.

Viewing the statute in this context, I cannot attribute to Congress an intention to preclude the City from maintaining a CERCLA action in this case. While the City is admittedly the owner of the Enterprise site, and might have been liable to the federal or state governments had those entities commenced the clean up,[10] the dispositive consideration is that the City did not operate a hazardous waste disposal facility on the premises and it asserts that it did not voluntarily permit the placement of the hazardous substances on its property.[11] Moreover, it has undertaken to clean up the ensuing damage and now seeks to recover its response costs from parties which were allegedly involved in the illegal dumping and which are made expressly liable for response costs. I cannot conclude that the City's right to maintain this action is barred by the hypothetical possibility that had the federal or state government brought this suit, the City too would be liable. The parade of horrors posited by defendants does not counsel against such a result. The simple fact is that there has been no expenditure of superfund monies nor have the federal or state governments commenced an action against the City or anyone else. Rather, a party which has incurred response costs seeks to recover them from responsible parties, an action expressly authorized by CERCLA. This action is not barred because of some theoretical inconsistencies with statutory provisions which have not been made operative in this case.

■ Defendants advance two additional reasons for the dismissal of the City's CERCLA claim, neither of which has merit. First, they contend that because the City failed to aver that it made demand upon them at least 60 days before commencing suit as required by 42 U.S.C. § 9612(a),[12] this court is without jurisdiction to hear the case. While the City concedes that notice was not pleaded, it represents in its brief that the required claim was timely made against defendants. The defendants do not specifically deny the substance of this asser-

---

10. The City has not seriously taken exception to defendants' characterization of its potential liability under 42 U.S.C. § 9607(a). I note in passing, however, that at least one commentator has argued persuasively that where an entity falls within the technical description of a responsible party but has little or no connection with the creation of the hazardous condition, the imposition of CERCLA liability may be unwarranted:

It is clear, however, that Superfund's strict liability standards should be confined to those parties who engaged in substantial and purposeful hazardous waste disposal activity for commercial profit after the enactment of this statute. Automatic application of strict liability to parties whose conduct was substantially unrelated to the present danger posed by the hazardous waste release or who did not obtain commercial benefit from their conduct, does not appear to be compelled by the environmental concerns which gave rise to Superfund.

Dore, *supra*, 57 Notre Dame Lawyer at 276. (footnotes omitted).

11. While the City did operate a landfill on the Enterprise site, it avers that it was used solely "for the disposal of municipal incinerator residue, which material is inert and non-hazardous." *Second Amended Complaint* ¶ 13.

12. This section provides as follows:

All claims which may be asserted against the Fund pursuant to section 9611 of this title shall be presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 9607 of this title. In any case where the claim has not been satisfied within sixty days of presentation in accordance with this subsection, the claimant may elect to commence an action in court against such owner, operator, guarantor, or other person or to present the claim to the Fund for payment.

tion,[13] but vigorously argue that notice is a jurisdictional prerequisite which must be pleaded. Although I am inclined to reject defendants' mechanistic interpretation of the claims procedure under section 112(a),[14] I need not rule on this issue in light of the City's representation that defendants did receive the requisite notice. I will, *mea sponte*, deem the complaint as amended to aver the giving of notice without prejudice to defendants' right to challenge the fact or sufficiency of notice on motion for summary judgment.

Second, defendants assert that the complaint cannot allege the City's clean up operation is consistent with the National Contingency Plan as required by 42 U.S.C. 9607(a)(4)(B) and therefore the CERCLA claim cannot proceed. This argument is not advanced with a great deal of clarity. Plaintiff has averred that its clean up is consistent with the national contingency plan. *See Second Amended Complaint* ¶ 54. Defendants seem to argue that notwithstanding this averment, plaintiff's complaint must fail because it does not allege detailed compliance with various requirements of the proposed national contingency plan.[15] I reject this contention. Even assuming that consistency with the plan goes to the existence of a claim for relief under CERCLA as opposed to the recoverability of various items of costs,[16] this is not an issue that can be resolved on the pleadings. Rather, its disposition must await the development of a record.

## COUNT II CLEAN WATER ACT [17]

The City predicates Count II of its complaint upon sections 311 and 505(a) of the Clean Water Act, 33 U.S.C. §§ 1321 and 1365(a). Section 311(b)(3) prohibits the illegal discharge of oil or hazardous substances

13. In their reply brief, defendants refer to the City's statement as "bald and misleading" but do not deny outright the receipt of a claim letter.

14. In *Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor*, 619 F.2d 231 (3d Cir. 1980), *cert. denied*, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981), the Court of Appeals adopted a "pragmatic approach" to the sixty day notice provision contained in section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b)(1). It determined that interpreting noncompliance to divest the court of jurisdiction would simply result in the dismissal and refiling of premature suits, a result it characterized as "excessively formalistic." *Id.* at 243. *See also Pymatuning Water Shed Citizens For a Hygienic Environment v. Eaton*, 644 F.2d 995 (3d Cir. 1981). Applying this reasoning, even if a timely claim was not made in this case, it is highly unlikely that this fact alone would require dismissal of the City's CERCLA claim.

15. Discussion of this issue is complicated by the fact that notwithstanding the 180 day deadline set forth in 42 U.S.C. § 9605, the EPA just recently adopted the revision of the plan contemplated by that provision. Defendants' substantive discussion is based upon a proposed plan which was published for public comment in the Federal Register. *See* 42 Fed.Reg. 10992 (March 12, 1982). However, on July 12, 1982, in compliance with a court order, the EPA issued a final plan which reflected a number of changes from the plan as originally proposed. *See* 13 Environment Reporter 364–65 (BNA July 16, 1982); 47 Fed.Reg. 31180 (July 16, 1982). While I am not unmindful of the anomaly in the City's pleading adherence to a plan not then in existence, I am not going to preclude the prosecution of this lawsuit at this stage simply because the EPA was delayed in discharging its responsibilities.

16. The legislative history of this aspect of CERCLA indicates that the national contingency plan was regarded as a means of assuring that responses under the act would be both cost-effective and environmentally sound:

> The plan will contain guidance on cost-effectiveness. Such guidelines are intended to assure that alternative remedial options are considered when planning cleanup actions at a particular site. This guidance will also provide both criteria and procedures for selection of the most cost-effective and environmentally sound alternative for remedying the site. This selection will require a balancing of a variety of factors, including cost and engineering, to achieve the health and environmental goals of the legislation.

126 Cong.Rec. S14965 (daily ed. Nov. 24, 1980) (remarks of Sen. Randolph). Thus, the question of compliance with the national contingency plan appears to be related to the recovery of damages and not to the existence of a valid claim for relief.

17. The Clean Water Act is also known as the Federal Water Pollution Control Act Amendments of 1972. *See*, e.g. *Aminoil U.S.A., Inc. v. California State Water Resources Control Board*, 674 F.2d 1227, 1229 (9th Cir. 1982).

"into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone . . . ." 33 U.S.C. § 1321(b)(3). Section 505(a) provides as follows:

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

The City alleges that defendants violated section 311 by discharging hazardous substances into the Delaware River and its adjoining shoreline and that section 505(a) provides it with an express right of action[18] to recover its "costs of removal".[19] Even accepting the dubious proposition that defendants themselves discharged hazardous substances within the meaning of the act, it is clear that the City's claim for damages is authorized by neither section 311 nor 505(a). Accordingly, I will grant defendants' motion for judgment on Count II of the complaint.

■ "Section 505 evidences a congressional intent to carefully channel public participation in the enforcement of the Act." *City of Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008, 1015 (7th Cir. 1979) (footnote omitted), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980). An examination of the language of this provision, as well as its legislative history, demonstrates conclusively that its sole purpose is to provide private parties with a mechanism to compel enforcement of effluent standards promulgated pursuant to the act.[20] It does not authorize a private right of action for the recovery of damages. Under section 505(a), a party may bring an action against any person who is alleged to be in violation of an effluent standard or

**18.** The City's complaint does not mention section 311 or 505(a). Initially, defendants moved for judgment on Count II of the complaint on the undeniably correct grounds that there exists no implied right of action under the Clean Water Act. *See Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). In its response to defendants' motion, the City disclaimed reliance upon an implied right of action and, for the first time, sought to predicate its claim upon section 505(a).

**19.** "Remove" or "removal" under the act refers to "removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare . . . ." 33 U.S.C. § 1321(a)(8).

**20.** The Clean Water Act is designed to achieve acceptable water quality standards in two ways. First, it imposes maximum "effluent

limitations" on "point sources." An effluent limitation is "any restriction established by a state or the Administrator [of EPA] on quantities rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources . . . ." 33 U.S.C. § 1362(11). A point source, in turn, is defined as "any discernible, confined, and discrete conveyance . . . from which pollutants are or may be discharged . . . ." 33 U.S.C. § 1362(14). Second, the CWA established the National Pollutant Discharge Elimination System (NPDES) which makes it unlawful to discharge a pollutant without obtaining a permit issued by the EPA or by a state authorized by the EPA to issue permits, and complying with its terms. *See Environmental Protection Agency v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 202–08, 96 S.Ct. 2022, 2023–24, 48 L.Ed.2d 578 (1976).

limitation or an order issued by the EPA or a state with respect to an effluent standard or limitation. In addition, he may sue the administrator of the EPA to compel the performance of "any act or duty under this chapter which is not discretionary ...." The district court's jurisdiction to entertain such an action is limited to enforcing the effluent standard or limitation, ordering the administrator to perform a nondiscretionary act, and imposing civil penalties under 33 U.S.C. § 1319(d).[21] Thus, the relief authorized by this section is purely prospective. Nowhere does it authorize a private party to recover damages for violations of the act.

That Congress did not intend to create such a right of action is amply borne out by section 505's legislative history. The Report of the Senate Committee on Public Works which accompanied Senate Bill S2770 makes clear that section 505 was not intended to authorize class actions or suits for damages:

> Section 505 does not authorize a "class action." Instead, it would authorize a private action by any citizen or citizens acting on their own behalf. Questions with respect to traditional "class" actions often involve: (1) identifying a group of people whose interests have been damaged; (2) identifying the amount of total damage to determine jurisdiction qualification; and (3) allocating any damages recovered. None of these points is appropriate in citizen suits seeking abatement of violations of water pollution control requirements. It should be noted, however, that the section would specifically preserve any rights or remedies under any other law. *Thus, if damages could be shown, other remedies would remain available.* Compliance with requirements under this Act would not be a defense to a common law action for pollution damages.

**21.** This section authorizes the imposition of a civil penalty not to exceed $10,000.00 per day for violations of 33 U.S.C. §§ 1311, 1312, 1316, 1317, 1318, 1328, or 1345.

**22.** With two exceptions not relevant here, section 505 as adopted "is the same as the comparable provision of the Senate Bill [S2770] and

S.Rep.No. 92–414, 92nd Cong., 1st Sess. 81, reprinted in 2 *A Legislative History of the Water Pollution Control Act Amendments of 1972,* 1415, 1499 (1973) (hereinafter "Legislative History") (emphasis supplied). Moreover, the House Report accompanying the House Amendments, H.R. 11896, was careful to note "[t]he [civil] penalties imposed would be deposited as miscellaneous receipts in the treasury *and not be recovered by the citizen bringing the suit.*" H.R. Rep.92–911, 92nd Cong. 2d Sess. 133, *reprinted in* 1 *Legislative History* 753, 820 (1973) (emphasis supplied). Similar sentiments were expressed by individual legislators in debate. *See, e.g.,* 1 *Legislative History* at 221 (remarks of Sen. Bayh). ("These sorts of citizen suits—in which a citizen can obtain an injunction but cannot obtain money damages for himself are a very useful additional tool in enforcing environmental protection laws.") [22]

In view of these unequivocal expressions of legislative intent, it is clear that section 505(a) does not, expressly or by implication, support the assertion of a claim for damages. This assessment is not altered by the City's alleging a violation of section 311 and labelling the monetary relief it seeks as "costs of removal." However it chooses to characterize its remedy, the simple truth is that the City wants money and section 505(a) does not authorize such a claim. Defendants' motion for judgment on Count II of the complaint will be granted.

## COUNT III  FEDERAL COMMON LAW OF NUISANCE

█ Count III of plaintiff's complaint is based upon the federal common law of nuisance first sanctioned by the Supreme Court in *Illinois v. City of Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972) (*Milwaukee I*). In *City of Milwaukee v.*

the House Amendment [H.R.11986] ...." S.Rep.No.92–1236, 92nd Cong.2d Sess. 145, *reprinted in* 1 *Legislative History* 281, 328 (1973) (Conference report), U.S.Code Cong. & Admin. News 1972, 3668. Senator Bayh's remarks occurred during the Senate discussion of the Conference Bill which was enacted.

*Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) (*Milwaukee II*), the Court held that the federal common law right of action established in *Milwaukee I* had been preempted by the Federal Water Pollution Control Act Amendments of 1972 which were enacted by Congress shortly after that decision was rendered. Relying on *Milwaukee II*, defendants move for judgment on Count III of the City's complaint on the grounds that there is no longer a federal common law of nuisance. Because I am convinced that "Congress has occupied the field through the establishment of a comprehensive regulatory program" *Milwaukee II, supra,* 451 U.S. at 317, 101 S.Ct. at 1792, I will grant this portion of defendants' motion.

The City of Milwaukee litigation involved the discharge of inadequately treated sewage into Lake Michigan, an interstate waterway. In *Milwaukee I*, the Court, noting the absence of comprehensive federal regulation of interstate water pollution, held "[w]hen we deal with air or water in their ambient interstate aspects, there is a federal common law . . . ." 406 U.S. at 103, 92 S.Ct. at 1392. It thus created a federal common law right of action to abate a public nuisance in interstate waters. However, five months after *Milwaukee I* was decided, Congress comprehensively amended the Federal Water Pollution Control Act to establish an elaborate system for regulating the discharge of pollutants from point sources through the issuance of permits by EPA and the states. In *Milwaukee II*, the Court determined that the federal common law right of action established in *Milwaukee I* had been preempted by the comprehensive regulatory program created by the FWPCA amendments:

> We conclude that, at least so far as concerns the claims of respondents, Congress has not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts and maxims of equity jurisprudence, but rath-

er has occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency.

451 U.S. at 317, 101 S.Ct. at 1792. Two months later, the Court extended this holding to an action involving the pollution of coastal waters. *See Middlesex County Sewerage Authority v. National Sea Clammers, supra.*

The City attempts to avoid the effect of these holdings by characterizing its complaint as one for interstate *groundwater* pollution. Since *Milwaukee II* involved the pollution of interstate *surface* waters and *Sea Clammers* the pollution of *coastal* waters, it argues that neither decision necessarily requires the dismissal of a federal nuisance claim for groundwater pollution. The distinction suggested by the City is without merit. Fairly read, its complaint is premised upon the illegal disposal of hazardous waste. The pollution of the groundwater underlying the Enterprise site is but one element of the damage resulting from that illegal disposal. Thus, assuming there once existed a federal common law action for the abatement of such a condition,[23] the dispositive inquiry is whether it has been preempted by Congressional regulation of the area. I have no difficulty concluding that it has.

Congress has occupied the hazardous waste disposal area by virtue of two comprehensive enactments. First, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.,* which was enacted in 1976, established an extensive regulatory scheme governing the "cradle to grave" management of hazardous waste. "Its goal is to insure that hazardous waste is safely handled from the point of generation to the site of ultimate disposal, and that disposal facilities permanently contain the waste without risk to the environment." R. Zener, Guide to Federal Environmental Law at 166 (1981). Toward this end, the statute requires that permits be obtained for the

**23.** See, *e.g., United States v. Solvent Recovery Services of New England,* 496 F.Supp. 1127 (D.Conn.1980) (upholding federal common law of nuisance claim for contamination of groundwater resulting from illegal dumping of hazardous waste).

treatment, storage, or disposal of hazardous waste. 42 U.S.C. § 6925. It imposes standards for generators, transporters, treaters, and disposers. 42 U.S.C. §§ 6921–24. Finally, it provides for both civil and criminal penalties for noncompliance. 42 U.S.C. § 6928.[24]

Second, Congress enacted CERCLA. CERCLA was designed to fill in some of RCRA's regulatory gaps "by requiring extensive reporting and recordkeeping for both present and former hazardous waste disposal sites." Dore, *supra*, 57 Notre Dame Lawyer at 268. As previously discussed, CERCLA also created a comprehensive system to finance the clean up of hazardous waste sites and has a civil liability provision designed to apportion the financial responsibility for clean up operations. It also mandates the revision of the national contingency plan to "establish procedures and standards for responding to releases of hazardous substances . . . ." 42 U.S.C. § 9605.

Unquestionably, Congress has occupied the field of hazardous waste disposal. In the RCRA it has comprehensively set forth the standards which are to govern every aspect of this activity from generation to disposal. In CERCLA, it has established a system of responding to releases or threatened releases from hazardous dumpsites, mandated the adoption of an extensive plan to govern such responses, and imposed a standard of strict liability on those parties involved in the disposal of hazardous waste. I can only concur in Judge Brotman's determination that "[t]he comprehensive nature of the schemes established by the RCRA and the CERCLA require [me] to conclude that, if federal common law ever governed this type of activity, it has since been preempted by those statutes." *United States*

*v. Price*, 523 F.Supp. 1055, 1069 (D.N.J. 1981). *See also United States v. Kin-Buc, Inc.*, 532 F.Supp. 699 (D.N.J.1982) (Clean Air Act preempts common law of nuisance as to air pollution). Accordingly, I will grant judgment in favor of defendants on Count III of the City's complaint.

COUNT V PENNSYLVANIA SOLID WASTE MANAGEMENT ACT

■ Count V of the City's complaint is brought under section 401(b) of the Pennsylvania Solid Waste Management Act, 35 P.S. § 6018.401(b) which provides:

> The storage, transportation, treatment, and disposal of hazardous waste are hereby declared to be activities, which subject the person carrying on those activities to liability for harm although he has exercised utmost care to prevent harm, regardless whether such activities were conducted prior to the enactment hereof.

The complaint alleges that defendants engaged in "disposal" of hazardous waste within the meaning of this section. *Second Amended Complaint* ¶ 86. As used in the SWMA, disposal means "[t]he incineration, deposition, injection, dumping, spilling, leaking, or placing of solid waste into or on the land or water in a manner that the solid waste or a constituent of the solid waste enters the environment, is emitted into the air or is discharged to the waters of the Commonwealth." 35 P.S. § 6018.103. Defendants contend that these provisions do not encompass an entity which generates the hazardous substances but contracts with a third party for their disposal.[25] I agree and will therefore grant judgment in their favor on this count of the City's complaint.

Although the City avers, in conclusory fashion, that defendants disposed of hazardous waste within the meaning of the

---

**24.** Moreover, the EPA recently issued final interim regulations characterized as "the final major piece of the hazardous waste control system mandated by Congress in the Resource Conservation and Recovery Act of 1976" 13 Environment Reporter 363 (BNA July 16, 1982). The regulations set forth two sets of comprehensive performance standards which form the basis for issuing permits to facilities which dispose of hazardous waste on land.

**25.** Defendants also argue that the application of this provision, which was enacted in 1980, to dumping activities which occurred in 1975–76 would be unconstitutionally retroactive. Because I have determined that section 401(b) is not applicable to defendants in any event, I need not reach this issue.

SWMA, the factual allegations of the complaint make it clear that defendants did not themselves "incinerate, depose, inject, dump, spill, leak, or place" their industrial waste on the Enterprise site. Rather, they arranged for independent contractors to remove the substances from their business premises and the contractors, in turn, disposed of the waste. There is no allegation that apart from giving the waste to the independent contractors, defendants played any role in its illegal placement on City property. Because the SWMA's definition of disposal clearly contemplates that a liable party itself dispose of the hazardous materials,[26] the actions of defendants in giving the waste to independent contractors for disposal does not fall within the ambit of the statute's liability provision.

The City attempts to avoid this result by contending that section 401 does not isolate discrete categories of waste handlers but, instead, focuses upon the overall process of waste management and therefore encompasses *any* party involved in this process. I cannot accept this assertion. Nothing in the language of section 401, or in the statute's definitions of its terms, supports the proposition that it is intended to include parties which generate hazardous waste but do not themselves dispose of it. Had the General Assembly intended such a result, it could have so provided by the inclusion of appropriate language. Indeed, an examination of other provisions of the SWMA demonstrates that when the Assembly intended

to impose civil or criminal sanctions upon generators of hazardous waste who contract with others for its disposal, it did so in an unambiguous manner. *See* 35 P.S. § 6018.-403(a) (making it unlawful for any person who "generates, transports or stores hazardous waste to transfer such waste" in violation of the Act); and 35 P.S. § 6018.-610(8) (making it unlawful for any person to "[c]onsign, assign, sell, entrust, give or in any way transfer" hazardous waste which is subsequently dumped or stored in violation of the act). In view of these considerations, the Assembly's failure to incorporate similar provisions into section 401 is fatal to the City's contention.[27]

Finally, the City argues that the SWMA is a remedial statute which must be construed liberally. However salutory this principle may be in the abstract, it cannot justify reading a provision into the statute in the absence of supporting language. *See Township of Monroe v. Department of Environmental Resources*, 16 Pa.Cmwlth.Ct. 579, 582, 328 A.2d 209, 211 (1974). (remedial environmental statute warrants "the broadest interpretation *consistent with the express language of the statute* ...."), 1 Pa.C.S.A. § 1921(b) ("[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit"). It may well be that the imposition of strict liability upon generators of hazardous waste who do not themselves dispose of it would be beneficial both for the environ-

---

**26.** In its reply brief, the City intimates that defendants may be held liable under this section because they knew or had reason to know that the work being performed by ABM and Lightman involved danger to others. Without question, under this, and certain other, circumstances a defendant may be held liable, either vicariously or for its own negligence, for the conduct of an independent contractor. *See* Restatement (Second) of Torts §§ 409–429 (1965); discussion, *infra*, at 1151–1154. However, these are common law theories of liability and Count V of the City's complaint is premised upon statutory liability imposed under section 401(b). Apart from incorporating a standard of strict liability, there is nothing in the SWMA or its legislative history that indicates such common law concepts are to be used in applying this provision. Moreover, the City has not al-

leged vicarious or supervisory liability in Count V but, rather, has averred that defendants *themselves* disposed of hazardous waste within the meaning of the act.

**27.** The City also points to a colloquy between Senator Mellow and Senator Hager which discussed the broad nature of the liability imposed by this provision. *See* 1980 Pa.Leg.Jour. (Senate) 1713 (June 2, 1980), *reprinted in* The Legislative History of the Pennsylvania Solid Waste Management Act of 1980 (1982). I cannot agree that this is dispositive of the issue presented here. The discussion centered on the standard of liability to be imposed upon those covered by the statute. It does not require the extension of that liability to parties not specifically named in section 401.

ment and for parties injured by improper disposal practices.[28] However, it is not for me to infer such a liability into a statutory provision which does not support that construction. Defendants' motion for judgment on Count V of the City's complaint will be granted.

## COUNT VI PENNSYLVANIA CLEAN STREAMS LAW

■ Count VI of the City's complaint seeks both damages and civil penalties and is predicated upon subsections (a) and (c) of 35 P.S. 691.601 which provide respectively:

(a) ... suits to abate ... nuisances or suits to restrain or prevent any violation of this act may be instituted in equity or at law in the name of the Commonwealth upon relation of the Attorney General, or upon relation of any District Attorney of any county, or upon relation of the solicitor of any municipality affected, after notice has first been served upon the Attorney General of the intention ... to so proceed ...

(c) ... any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act ... or against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act .....

Defendants posit two arguments in moving against this portion of the City's complaint. First they contend that these provisions support only a claim for injunctive relief and not one for damages. Second, they assert that the City has not pleaded a violation by defendants of the Clean Streams Law.[29] I agree with defendants' first argument and will therefore enter judgment in their favor on Count VI of plaintiff's complaint.

■ The statutory provisions upon which the City relies do not expressly authorize an action for damages. Rather, they permit only "suits to abate ... nuisances"; "suits to restrain or prevent any violation of this act," and civil actions "to compel compliance with this act." It is abundantly clear, then, that subsections (a) and (c) of section 601 contemplate only actions for the abatement of a public nuisance or, alternatively, an enforcement action brought by a party adversely affected by another's noncompliance with the statute. Where, as here, "legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies." *Kroungold v. Triester,* 407 F.Supp. 414, 420 (E.D.Pa.1975). In the absence of more explicit authorization from the General Assembly, I am not free to engraft an additional right of action upon statutory provisions which do not contemplate such a right.[30]

The City attempts to circumvent this obstacle by asserting that "[t]he ability to obtain a monetary judgment in aid of abating a nuisance under the Clean Streams Law is well established in Pennsylvania." *Brief of the City of Philadelphia* at 26. The only authority cited for this proposition is *Commonwealth v. Barnes & Tucker Co.,* 23

---

**28.** *See, e.g.,* Note, *Allocating the Costs of Hazardous Waste Disposal,* 94 Harvard Law Review 584 (1981) (proposing joint and several liability for all firms "associated in some way with hazardous wastes"); Note, *An Analysis of Common Law and Statutory Remedies for Hazardous Waste Injuries,* 12 Rutgers Law Journal 117, 128–31 (1980) (advocates imposition of strict liability on deep pocket theory).

**29.** The defendants contend that in view of the City's averments, the actual creation of the nuisance was accomplished by ABM, Light-

man, and the City employees who permitted those contractors onto the site.

**30.** Moreover, the Clean Streams Law explicitly provides that "nothing in this act contained shall in any way abridge or alter rights of action or remedies now or hereafter existing in equity or under the common law or statutory law ...." 35 P.S. § 691.701. Thus, although the City may not predicate a claim for damages upon section 601, it may still maintain a common law nuisance claim for damages. *See discussion, infra.*

Pa.Cmwlth.Ct. 496, 353 A.2d 471 (1976), *aff'd* 472 Pa. 115, 371 A.2d 461, *appeal dismissed*, 434 U.S. 807, 98 S.Ct. 38, 54 L.Ed.2d 65 (1977). I cannot agree that this case may be so broadly construed. The Barnes & Tucker litigation was an action by the Commonwealth to compel the company to abate a public nuisance, i.e., the drainage of acid water from one of its mines. After suit was commenced, Barnes & Tucker breached a court-approved consent decree which obligated it to operate a treatment facility in the mine. The Commonwealth Court issued a preliminary injunction ordering the continued operation of the facility pending final adjudication of the case on its merits. The Commonwealth then undertook to operate the facility. In its final decree, the court ordered Barnes & Tucker to abate the condition and to compensate the Commonwealth for its expenses incurred in operating the treatment facility. Thus, this order stemmed from Barnes & Tucker's breach of the stipulation and was designed to reimburse the Commonwealth for carrying out the company's obligation. It does not support the City's broad assertion that damages are recoverable under 35 P.S. § 691.601 whenever a party undertakes to abate a nuisance.

█ Finally, I must grant judgment in favor of defendants on the City's claim for civil penalties under CSL. The imposition of civil penalties is governed by 35 P.S. § 691.605 which provides that "[i]n addition to proceeding under any other remedy available at law or in equity for a violation of a provision of this act ... *the department*,[31] after hearing, may assess a civil penalty upon a person or municipality for such violation." (emphasis added) Thus, the statute by its own terms, restricts the right to collect civil penalties to the Depart-

ment of Environmental Resources. Nowhere does it extend this right of action to any of the parties authorized to maintain an abatement or enforcement action under 35 P.S. § 691.601. Moreover, civil penalties which are assessed are payable only to the Commonwealth's treasury for deposit in a special fund designated "The Clean Water Fund." 35 P.S. § 691.8. Given these statutory provisions, I can only conclude that private parties are not authorized by CSL to maintain an action for civil penalties.

For all of the foregoing reasons, judgment will be entered in defendants favor on Count VI of the City's complaint.[32]

COUNT VII  COMMON LAW TRESPASS

In Count VII of its complaint, the City alleges that defendants "did intentionally, willfully, recklessly, negligently, and with wanton disregard for the consequences, trespass and cause others to trespass on City-owned property for the purpose of dumping defendants' hazardous wastes." *Second Amended Complaint* ¶ 103. Defendants contend that ABM and Lightman's entry onto the Enterprise site was not unlawful because the City's own employees accepted the bribes and permitted the dumping. Moreover, defendants argue that the complaint makes no allegation that they themselves entered upon the Enterprise site or authorized ABM and Lightman to do so. While I recognize the weakness of the City's case under the facts pleaded, I cannot conclude at this juncture that it has failed to allege a valid trespass claim. Accordingly, I will deny defendants' motion for judgment on this count.

█ Defendants' first argument is premised upon the well-established principle that a right of entry constitutes an absolute

---

**31.** "Department" as used in the CSL refers to the Department of Environmental Resources, the Environmental Quality Board, or the Environmental Hearing Board. 35 P.S. § 691.1.

**32.** Defendants also assert that the City is precluded from maintaining this action because its complaint does not aver that it gave notice to the Attorney General of its intention to bring suit as required by 35 P.S. 691.601(a). In its supplemental reply brief, the City belatedly produced a letter from an assistant city solicitor to the State Attorney General advising of the impending suit. While I have difficulty understanding the City's delay in producing this document, I will not dismiss Count VI merely because it did not plead notice. *See Commonwealth ex rel. Shumaker v. New York & Pennsylvania Co.*, 367 Pa. 40, 57, 79 A.2d 439, 448 (1951).

defense to an action in trespass. *See Gedekoh v. Peoples Natural Gas Co.*, 183 Pa.Super. 511, 514, 133 A.2d 283, 284–85 (1957). Here, they assert, the complaint demonstrates that entry onto the Enterprise site was made with the permission of the City's own employees and therefore a viable trespass claim has not been alleged. The flaw in this argument is self-evident. In permitting ABM and Lightman to enter upon the site, and illegally dispose of substantial quantities of industrial waste, the City employees were unquestionably acting outside the scope of their authority. Indeed, they accepted bribes from the waste haulers to permit them onto the site. Clearly, the City is not bound by the unauthorized, illegal actions of two recreant employees and, under the circumstances it is frivolous to assert that ABM and Lightman were authorized to enter upon and damage the City's property.

■ Defendants' second argument is also unavailing. Section 427B of the Restatement (Second) of Torts (1965) provides:

> One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance.

Comment b elaborates upon the standard of liability set forth in this provision:

> It applies in particular where the contractor is directed or authorized by the employer to commit such a trespass, or to create such a nuisance, and where the trespass or nuisance is a necessary result of doing the work, as where the construction of a dam will necessarily flood other land. It is not, however, necessary to the application of the rule that the trespass or nuisance be directed or authorized, or that it shall necessarily follow from the work. It is sufficient that the employer has reason to recognize that, in the ordinary course of doing the work in the usual or prescribed manner, the trespass or nuisance is likely to result.

Admittedly, the City's complaint does not allege that defendants had reason to recognize the likelihood that ABM or Lightman would trespass upon the property of another in disposing of their waste. However, it does allege the physical act of trespass by the independent contractors and defendants' responsibility for that act. In light of these averments, the evidentiary link necessary to establish defendants' liability is a question of fact and, at this stage of the litigation, I am unwilling to foreclose the City's offering proof on this issue. Accordingly, defendants' motion for judgment on Count VII of the City's complaint will be denied.[33]

COUNTS III (Common Law Nuisance), IV (Common Law Strict Liability) and VIII (Negligence)

The City's complaint contains several other Pennsylvania common law causes of action. Count III alleges that defendants created a public nuisance.[34] Count IV alleges

---

**33.** Defendants also contend that because section 427B of the Restatement has not explicitly been adopted as the law of Pennsylvania in any reported case, I should refrain from applying it in this case. This argument is without merit. As a general matter, the Pennsylvania courts have "not hesitated to adopt sections of the [Restatement] when [their] common-law precedents varied from the Restatement or when the Pennsylvania common law provide[s] no answer." *Gilbert v. Korvette, Inc.*, 457 Pa. 602, 611–12 n. 25, 327 A.2d 94, 100 n. 25 (1974). (citing cases). In accordance with this observation, the Pennsylvania courts have consistently adopted the Restatement formulations of the circumstances under which an employer is liable for the tortious conduct of an independent contractor. *See Sharkey v. Airco Inc.*, 522 F.Supp. 646 (E.D.Pa.1981), aff'd mem., 688 F. 2d 824 (3d Cir. 1982); *DiSalvatore v. United States*, 456 F.Supp. 1079 (E.D.Pa.1978); *Gonzalez v. United States Steel Corp.*, 484 Pa. 277, 398 A.2d 1378 (1979); *Byrd v. Merwin*, 456 Pa. 516, 317 A.2d 280 (1974); *Hargrove v. Frommeyer*, 229 Pa.Super. 298, 323 A.2d 300 (1974).

**34.** Strictly interpreted, Count III does not specifically allege a common law nuisance claim but is confined to the federal common law of nuisance. However, defendants have chosen to treat the complaint as also averring a state common law nuisance cause of action.

that they are strictly liable because they engaged in abnormally dangerous activities.[35] Count VIII avers that defendants were negligent in the selection, training, and supervision of ABM and Lightman and that this negligence was the proximate cause of the illegal dumping on the Enterprise site. Defendants move for judgment on these counts asserting that, as a matter of law, the criminal behavior of the City employees and independent contractors was a superseding cause of the City's harm and that the City was contributorily negligent as a matter of law.[36] Because the City's claims raise issues which cannot be disposed of on summary motion, I must reject defendants' arguments.

■ There is no question that the criminal conduct of the independent contractors and the City's own employees was a crucial link in the chain of events which led to the dumping of defendants' waste on City property. However, "[n]ot every intervening force is a superseding force." *Ford v. Jeffries*, 474 Pa. 588, 595, 379 A.2d 111, 114 (1977). The circumstances under which an actor may be held liable notwithstanding an intervening criminal act by a third person are set forth in Restatement (Second) of Torts § 448:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

The question of a defendant's liability under these standards is almost invariably one of fact for the jury. *Douglas W. Randall, Inc. v. AFA Protective Systems, Inc.*, 516 F.Supp. 1122, 1125 (E.D.Pa.1981); *Anderson v. Bushong Pontiac Co., Inc.*, 404 Pa. 382, 391, 171 A.2d 771, 775 (1961).

■ Here, the City alleges that defendants were negligent in selecting ABM and Lightman as their waste disposal contractors particularly in view of the hazardous nature of the materials being generated. It may well be that the proper disposal of hazardous waste is an expensive undertaking thus inducing unscrupulous waste haulers to dispose illegally of such materials in order to reduce costs. Were this propensity known to defendants, such illegal conduct would unquestionably be within the scope of the risk created by the negligent hiring and supervision of ABM and Lightman and defendants would have had reason to foresee such an occurrence. On the other hand, the City's proof in this respect may be deficient. The important point is that this is not a matter which can be resolved on the face of plaintiff's complaint.

These same considerations govern the argument that the City was contributorily

---

**35.** I note that defendants have not challenged the City's characterization of their activities as "abnormally dangerous" and, as such, warranting the application of strict liability. *See* Restatement (Second) of Torts §§ 519, 520 (1977); *Federoff v. Harrison Construction Co.*, 362 Pa. 181, 66 A.2d 817 (1949). Although my research has not revealed any Pennsylvania cases which have held the generation and disposal of hazardous waste to be abnormally dangerous within the Restatement formulation, the issue has prompted a split of authority in other jurisdictions. *See generally*, Note, *Strict Liability for Generators, Transporters, and Disposers of Hazardous Wastes*, 64 Minnesota Law Review 949, 967–85 (1980); Note, *supra*, 69 Georgetown Law Journal at 1063–65.

**36.** Defendants also assert that the City's complaint reveals it assumed the risk of damage to the Enterprise site as a matter of law. There are two problems with this argument. First, the Pennsylvania Supreme Court has abolished assumption of the risk as a defense to a negligence action. *Rutter v. Northeastern Beaver County School District*, 496 Pa. 590, 437 A.2d 1198 (1981). Assuming that this holding does not retroactively encompass actions commenced prior to the decision, the defendants' argument borders on the frivolous. Assumption of the risk involved a factual determination and cannot be resolved on a summary motion.

negligent as a matter of law.[37] I note as a threshold matter that such a holding would contravene the well established rule that contributory negligence as a matter of law can only be declared in a case that is free from doubt. *Tonik v. Apex Garages, Inc.,* 442 Pa. 373, 377, 275 A.2d 296, 298 (1971). More fundamentally, I am at a loss to understand how such a determination can be made on the basis of the facts set forth in the pleadings. The jury may well determine that the city negligently failed to supervise adequately its employees and inspect the Enterprise site and that this negligence bars it from recovering against defendants. However, it is not an issue to be resolved by summary motion.

## COUNT IX THE PHILADELPHIA CODE

■ The City premises the final count of its complaint upon violations of several provisions of the Philadelphia Code.[38] Because the code is exclusively penal in nature and does not endow the City with a substantive right of action to obtain compensatory damages for violations of its provisions, I will grant defendants' motion for judgment on this claim.

■ It is well established that:

An ordinance cannot primarily and directly have the effect of creating a civil liability, since like other legislative enactments it is to be treated as a declaration of policy rather than a contractual term, although it may, incidentally to its police or other proper governmental object, indirectly give rise to a duty between per-

sons with the consequence that its violation constitutes or evidences actionable negligence or wrong. Moreover, an ordinance may have the effect of vesting private rights.

5 E. McQuillin, The Law of Municipal Corporations § 15.14 at 64 (3d ed. 1981). (footnotes omitted) The Philadelphia Code is penal in nature. It does no more than authorize the City to impose fines for violations and, if the fine is not paid within a certain time, to imprison the violator.[39] *See,* e.g., Philadelphia Code §§ 1–109; 10–502. Nowhere does it purport to create a right of action on the part of the City to obtain compensatory damages. Thus while defendants alleged violations of the Code may permit a finding of negligence *per se* on the City's negligence claim, *see Kaplan v. Philadelphia Transportation Co.,* 404 Pa. 147, 171 A.2d 166, 167 (1961), to the extent that the City attempts to assert a claim predicated solely upon the Code, I will grant judgment in defendants' favor.

## CONCLUSION

In summary, I have granted judgment for the defendants on the City's claims under the Clean Water Act, the federal common law of nuisance, the Pennsylvania Solid Waste Management Act, the Clean Streams Law, and the Philadelphia Code. I will permit the City to pursue its claim for response costs under the Comprehensive Environmental Response, Compensation, and Liability Act, and for damages on its state common law nuisance, trespass, strict liability, negligence claims.

---

**37.** Although Pennsylvania has enacted a comparative negligence statute, 42 Pa.C.S.A. § 7102, it is applicable only to causes of action which arise after September 7, 1976, the date of its enactbut. *Fahringer v. Rinehimer,* 283 Pa.Super. 93, 101, 423 A.2d 731, 735 (1980); *Costa v. Lair,* 241 Pa.Super. 517, 363 A.2d 1313 (1976). The City does not seriously dispute that because virtually all of the dumping in question occurred prior to September 7, 1976, the City's conduct must be judged under the standard of contributory negligence.

**38.** Specifically, the City alleges violations of section 10–710 which prohibits the unauthor-

ized dumping of debris on city property and section 10–501 which proscribes the intentional infliction of damage on City property.

**39.** As part of its claim on this count, the City asks that I impose a fine of $300.00 per day for each day that defendants have been in violation. *See* Philadelphia Code §§ 10–502. I decline this invitation to act as a surrogate magistrate. If the City feels that fines are warranted, it may pursue the procedures set forth in the Code for their assessment and collection. *See* Philadelphia Code § 10–718.