**VERSATILE METALS, INC., and Versatile Oxide, Inc.**

v.

**The UNION CORPORATION and the Metal Bank of America.**

**Civ. A. No. 85–4085.**

United States District Court, E.D. Pennsylvania.

June 15, 1988.

Michael W. Ford, Chapman & Cutler, Chicago, Ill., Thomas W. Murrell, III, Morgan, Lewis & Bockius, Philadelphia, Pa., for plaintiffs.

John Mattioni, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

JAMES McGIRR KELLY, District Judge.

This action arose from a dispute concerning a contract for the sale of assets and the lease/purchase of real property located at 6801 State Road in Philadelphia, Pennsylvania, which was discovered to be substantially contaminated with polychlorinated biphenyls (PCBs) six months into the tenancy of the plaintiffs-tenants Versatile Metals, Inc. and Versatile Oxide, Inc. Plaintiffs (referred to hereinafter collectively as "Versatile Metals") filed their Complaint on July 16, 1985 alleging substantial damages for a breach of express warranties, breach of implied warranties, breach of contract, and fraudulent misrepresentation due to the presence of the contamination at the property. On September 4, 1985 defendants The Union Corporation and The Metal Bank of America (referred to hereinafter collectively as "Metal Bank") filed their answer and counterclaimed for breach of contract, breach of lease, breach of an indemnification clause, waste, fraud, and an action for cost recovery under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.* (1982).

From December 2, 1987 to February 5, 1988 this case was tried before this Court and a jury. This court reserved judgment on defendant's counterclaim under CERCLA. On the thirty-ninth day of trial, the jury returned its verdict consisting of answers to the special interrogatories submitted by this Court on February 8, 1988. The parties were directed to submit proposed forms of judgment to be rendered based on the jury's answers to the special interrogatories. This Memorandum and Order represents this Court's judgment on the verdict returned by the jury pursuant to Rule 58 of the Federal Rules of Civil Procedure and the findings of fact and conclusions of law as to the defendant's counterclaim under CERCLA pursuant to Rule 52.

The substantive law of Pennsylvania has been applied to the state law claims. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct.

817, 82 L.Ed. 1188 (1938). Pennsylvania contracts for the sale of goods are governed by the Uniform Commercial Code. 13 Pa. Consol.Stat. § 2101 et seq. (1980). The sale and lease of real estate is governed by the law of Pennsylvania.

The parties are in agreement that the issue of whether the terms of the subject contracts constitute certain express warranties is a matter for this court. The language of the contracts is clear and unambiguous. The interpretation of a written contract that is clear and unambiguous is for the court. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1271 (3d Cir.1979); *Baltimore Bank For Cooperatives v. Farmers Cheese Cooperative*, 612 F.2d 151, 153 (3d Cir.1979).

Plaintiffs contend that Sections 2.04, 2.06 and 4.05 of the Asset Purchase Agreement and Section 5 of the Lease Purchase Agreement constitute express warranties. Plaintiffs state that these warranties were breached because the equipment and inventory purchased and the land leased by plaintiff under the agreement were contaminated by PCBs.

In deciding whether the terms of a contract constitute express warranties, the Court must look to 13 Pa.Cons.Stat. § 2313 (1980). It is not necessary for the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the opinion of the seller or commendation of the goods does not create a warranty. 13 Pa.Cons.Stat. § 2313(b) (1980).

Three fundamental issues are presented. First, the Court must determine whether the statement constitutes an "affirmation of fact or promise" or "description of the goods". Second, assuming the court finds the language used susceptible to the creation of a warranty, it must then be determined whether the statement was "part of the basis of the bargain." If it was, an express warranty exists. *Sessa v. Riegle*, 427 F.Supp. 760, 765 (E.D.Pa.1977), *aff'd* 568 F.2d 770 (3d Cir.1978).

Section 4.05 of the Asset Purchase Agreement provides: [1]

4.05 *Environmental Matters.* Seller and Union jointly and severally represent and warrant to Buyer that as of November 26, 1984 the land included in the Leased Premises was free of contamination in violation of any applicable federal, state or local law or regulation relating to the protection of health, safety and environment. Seller and Union jointly and severally agree to indemnify and hold Buyer harmless from any and all costs, damages, liabilities and expenses resulting from hazardous waste in the Inventory existing on and the land included in the Leased Premises at November 20, 1984, provided that, with respect to the Inventory, Buyer acts in the following manner:

(a) Buyer shall keep all Inventory purchased hereunder segregated from any other inventories of Buyer;

(b) Buyer shall give seller prompt telephone notice (tel. 412–362–1700, attention Raymond Beacha or Raymond T. Royko, or to such other number or persons as Seller may direct by written notice to Buyer) upon discovery of capacitors or other items in such inventory that may contain hazardous waste and shall at the sole expense, risk and liability of Seller cooperate with Seller in Seller's removal and shipment of such items; and

(c) Buyer shall act in a reasonable manner both before and after discovery of items containing hazardous wastes in order to prevent leakage and otherwise minimize contamination or other damage.

A careful reading of this section produces the following understanding of its terms. First, it contains an express warranty that the land included in the "Leased Premises" is free of any contamination which would be violative of applicable laws or regulations. Defendants do not contest

the import of this statement. Secondly, the Seller agreed to indemnify and hold Buyer harmless from any damage resulting from the presence of hazardous waste in the Inventory and the land on or before November 20, 1984 providing Buyer complied with the aforementioned conditions. The Court submitted special interrogatories to the jury based on this finding.

In response to the Special Interrogatories submitted by the Court, the jury found that the property at 6801 State Road was substantially contaminated both before and after the plaintiffs took possession of the property on November 20, 1984. The contamination that occurred after November 20, 1984, or while the plaintiffs were in possession, resulted from hazardous waste material, including items which contained PCB contaminants, already on the site prior to their tenancy and purchase. The jury did not find that the contamination was due to any additional hazardous waste material which was brought on the site by the plaintiffs after they took possession.

The jury found that Versatile Metals failed to substantially comply with paragraphs (a), (b) and (c) of Section 4.05 of the Asset Purchase Agreement, and this failure to comply substantially prejudiced the defendants. When asked to apportion the fault between the parties, the jury found that Versatile Metals was fifty-five percent responsible and Metal Bank forty-five percent responsible for the contamination. The reasonable clean-up costs incurred by Metal Bank attributable to Versatile Metals' actions was found to be $1,107,489. Further, the jury found that the contamination at the site was not a substantial factor in bringing about the harm Versatile Metals claimed in this case.

The following is this Court's interpretations of the factual findings of the jury.

---

**1.** This section appears under Article IV of the Asset Purchase Agreement entitled "Conduct of Business After November 20, 1984". Article IV contains terms relating to the time of possession and operating control of the Leased Premises, Inventory and Equipment. Terms included in this section include which contracts undertaken by Seller will be honored by Buyer, (Section

4.02), when Buyer may sell inventory for its own account (Section 4.01), how Buyer may assume or require Seller to cancel the lease agreement for Seller's phone (Section 4.02), the access of Buyer to the books of Seller, (Section 4.03), and the requirement of confidentiality (Section 4.04).

First, this Court previously found that Sections 2.04, 2.06 and 4.05 of the Asset Purchase agreement constituted as a matter of law express warranties. Since the jury found substantial contamination to the land *after* Versatile Metals took possession as well as before, Section 4.05 is the section most relevant to the findings of the jury. *See infra* p. 4. Section 4.05 expressly warrants that the "land" was free of any contamination which would violate any applicable laws or regulations. Metal Bank agreed to indemnify Versatile Metals from any damage which resulted from the presence of hazardous waste in the inventory at the time of the Agreement, providing Versatile Metals complied with the conditions in paragraphs (a), (b) and (c).

■  Since the property was found to be substantially contaminated before Versatile Metals took possession pursuant to the Agreement, Metal Bank materially breached the express warranty. Since Metal Bank materially breached the contracts, recovery on the contract under the counterclaims for breach of contract and breach of the lease is barred.

■  Metal Bank's fraud claim must necessarily fail as well. Defendants' counterclaim for fraud alleges that Versatile Metals fraudulently entered into the Agreement and Lease with the intention of breaching it. Since Versatile Metals could validly cancel the Agreement due to Metal Bank's breach, there could not be any fraud.

■  The State Road property was found to have been substantially contaminated after Versatile Metals took possession. This contamination occurred from the mishandling of the hazardous waste in the inventory which was left on the site by the defendants. However, the jury found that Versatile Metals failed to fulfill the conditions on the express warranty as to any damage resulting from the presence of hazardous waste material in the inventory. The failure of Versatile Metals to fulfill the conditions in Section 4.05 is a bar to recovery on their claim for indemnification and breach of contract under the agreements. Versatile Metals is barred from recovering on their breach of contract claim since they failed to give notice of the breach, and failed to act reasonably upon discovering the contamination. Versatile Metals' failure to comply with the conditions of the warranty substantially prejudiced Metal Bank.

■  Versatile Metals alleged fraudulent misrepresentation by Metal Bank for their alleged failure to disclose the material fact that the land was contaminated at the time the agreement was signed. However, since Versatile Metals failed to prove that the actions of Metal Bank were a proximate cause of their harm, Versatile Metals' fraud claim must similarly fail.

■  Versatile Metals' claim for constructive eviction fails. The covenants for quiet possession relate only to the acts of the lessor and those acting under him and do not extend to the "conduct of other persons by which the value or the comfort of the leasehold may be diminished." *No. 14 Coal Co. v. Pennsylvania Coal Co.*, 416 Pa. 218, 206 A.2d 57, 58 (1965). Since Versatile Metals substantially contributed to the contamination, they cannot claim for constructive eviction.

■  Defendants alleged a claim for waste. Under Pennsylvania law, an implied covenant exists to return a leasehold premises in substantially the same condition in which it existed when received, except for usual wear and tear, and uninjured by any willful or negligent act of the lessee. *U.S. Gypsum Co. v. Schiavo Bros. Inc.*, 450 F.Supp. 1291 (1978), *aff'd in part, rev'd in part,* 668 F.2d 172 (3d Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982), *quoting Earle v. Arbogast*, 180 Pa. 409, 36 A. 923 (1897); 22 P.L.E. Landlord and Tenant 823 § 237. The jury's finding that Versatile Metals contributed to the contamination of the leasehold by failing to use reasonable care upon the discovery of hazardous waste materials entitled Metal Bank to recover the cost of necessary repairs incurred to restore the property to its former condition before the tenancy. The jury found that the amount of reasonable clean-up costs

incurred by Metal Bank as a result of Versatile Metals' actions was $1,107,489.

Versatile Metals contends that they are entitled to a return of net monies received by Metal Bank on the resale of certain equipment owned by Versatile Metals but left behind on the site. The special interrogatories submitted to the jury, as structured, did not allow the jury to take this matter into account when awarding damages to Metal Bank. Therefore, a new trial will be held solely for the purpose of determining the amount of net monies received by Metal Bank on the resale of equipment owned by Versatile Metals, if any. The parties are of course free to stipulate to an appropriate figure in order to expedite the entry of judgement in this matter.

■ Defendants have moved for delay damages pursuant to Pennsylvania Rule of Civil Procedure 238. Rule 238 is applicable solely to tort actions and does not provide for delay damages for contract claims. *Reliance Universal Inc. of Ohio v. Ernest Renda Constracting Co.*, 308 Pa.Super. 98, 107, 454 A.2d 39, 44 (1982). Therefore, defendants' motion is denied.

### CERCLA Claim

In Count V of the counterclaim, defendants allege a private party action for contribution for costs they incurred in performing removal or remedial actions at the State Road property pursuant to Section 104(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a)(1) (1982). Defendants allege that as operators of the facility at the State Road property, plaintiffs are "responsible parties" under CERCLA. Defendants, as owners and past operators of the facility, allege that they are entitled to contribution for clean-up costs defendants were obligated to incur to remedy the release or threat of release of PCBs and other hazardous substances caused or substantially contributed to by plaintiffs. Defendants seek contribution in the form of compensatory, consequential, incidental, and punitive damages as well as attorney's fees and costs.

### Background

Plaintiff, Versatile Metals, Inc., (Versatile Metals), is a corporation incorporated under the laws of the state of Kentucky and has its principal place of business in Schaumberg, Illinois. Plaintiff, Versatile Oxides, Inc. (Versatile Oxide), was incorporated on or about December 28, 1984 in the state of Delaware and has its principal place of business in Schaumberg, Illinois. Defendant, the Union Corporation (Union), is a corporation incorporated in 1962 under the laws of the state of New Jersey and has its principal place of business in Norwalk, Connecticut. Defendant, The Metal Bank of America, Inc., a Pennsylvania corporation, is a wholly-owned subsidiary of Union. I will refer to plaintiffs collectively as "Versatile Metals" and defendants as "Metal Bank".

Beginning in approximately 1969, Metal Bank was involved in the processing of used transformers to reclaim the copper cores and iron casings. Operations were carried out at Metal Bank's site which they owned at 6801 State Road in Philadelphia, Pennsylvania. In the fall of 1984, Metal Bank and Versatile Metals entered into negotiations for the lease/purchase of the State Road property and the sale of the assets, including the inventory, equipment, and machinery located on the subject property. A letter of Intent was signed between Versatile Metals and Metal Bank on November 20, 1984 which contemplated the execution of a formal agreement.

Versatile Metals paid Metal Bank $50,000 on November 21, 1984 and took sole possession of the property on that date. Versatile Oxide was incorporated in late December, 1984. Pursuant to Section 7.07 of the Asset Purchase Agreement, Metal Bank tendered to Versatile Oxide a Bill of Sale for certain equipment at the property which had been used in the production of oxides by Metal Bank. Versatile Oxide continued in the production of copper oxides with this equipment.

The transaction closed on January 4, 1985 with the execution of the Asset Purchase Agreement and the Lease/Purchase Agreement. Between November 21, 1984

and May, 1985, when Versatile Metals left the site, Versatile Metals was engaged in the sale of scrap metal inventory and items of equipment and machinery at the property.

In late April, Versatile Metals discovered substantial areas of oily ground. Versatile Metals' representative, David Berkowitz, directed Metal Bank's chemist to take samples of certain areas of the property. The samples revealed substantial PCB contamination. Metal Bank requested that Versatile Metals vacate the property because of the suspected contamination. Versatile Metals vacated the property.

Metal Bank reported the sample results to the National Response Center, EPA Region III, the City of Philadelphia, and the Pennsylvania Department of Environmental Resources. In mid-May, Metal Bank hired Dr. Kleppinger as a consultant to recommend a proper course of action for ridding the site of the contamination. A preliminary assessment of the site revealed substantial contamination that was the result of both long-term and recent spills of PCB contaminants onto the ground, presumably leakage from capacitors and transformers which were present in the piles of inventory. Capacitors and transformers contain amounts of PCB's which spill out when they are broken or crushed.

A private party response action was initiated by Metal Bank in May and continued until approximately March, 1986. Versatile Metals did not participate in the response initiative, but filed this action in July, 1985.

## A. *LIABILITY UNDER CERCLA*

Section 107 of CERCLA provides in pertinent part:

Notwithstanding any other provision or Rule of law, and subject only to the defenses set forth in subsection (b) of this section—

the owner and operator of a vessel (otherwise subject to the jurisdiction of the United States) or a facility ..., from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for ... any other

necessary costs of response incurred by any responsible person consistent with the national contingency plan ...

42 U.S.C. § 9607(a) (1982).

■ Metal Bank, as an admittedly "responsible party" under the Act, undertook the clean-up, and now seeks contribution for the "necessary costs of response" under 42 U.S.C. § 9607(a)(4)(B). A potential "responsible person under the Act" may sue for contribution for the necessary costs of clean-up even though the federal or state governments have not yet chosen to commence an action against the liable parties. *See City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135 (E.D.Pa. 1982). "Responsible" persons may be held liable jointly and severally for, *inter alia,* private response costs which are incurred "by any other person" consistent with the national contingency plan. *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. at 1140–1141. Section 113(f)(1) provides:

"Any person may seek contribution from any other person who is liable or potentially liable under Section 9607(a) of this title ..."

42 U.S.C. § 9613(f)(1).

■ As a former operator of the State Road "facility" from which a "release" of a hazardous substance occurred which prompted the incurrence of response costs, Versatile Metals and Versatile Oxides are both "responsible persons" under the Act. Defendants Union Corporation and Metal Bank are also "responsible persons" as owners and operators of the facility. The harm suffered is indivisible since it is not possible to distinguish contamination due solely to the acts of either party. Therefore, since Versatile Metals and Metal Bank are responsible persons and the harm is indivisible, they are jointly and severally liable for the costs incurred for the necessary response actions that were consistent with the National Contingency Plan (the "NCP").

## B. *Defenses to Liability*

### 1. *Equitable Defenses*

■ Versatile Metals contends that Metal Bank is estopped from recovering

any clean-up costs, assuming they were necessary and incurred consistently with the NCP, under the defense at common law of contribution and restitution since the contamination was caused by the presence of hazardous waste which Metal Bank left at the site prior to Versatile Metal's tenancy. Any contamination present on the site prior to Versatile Metal's possession contravened the express warranty contained in the Asset/Purchase Agreement and Lease/Purchase Agreement that the land was free of any contamination. Versatile Metals urges this court to declare that equitable defenses supplement the statutory defenses provided under CERCLA.

Section 107(a) imposes strict liability on responsible parties "[n]otwithstanding any other provision or rule of law, and subject *only* to the defenses set forth in subsection (b) of this Section ..."[2] 42 U.S.C. § 9607(a) (1982) (*emphasis added*). *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135, 1140 n. 4 (E.D.Pa.1982); *U.S. v. Tyson,* 25 ERC 1897, 1899–1900 (E.D.Pa.1986) [available on WESTLAW, 1986 WL 9250]; *New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985); *Developments in the Law–Toxic Waste Litigation,* 99 Harv.L.Rev. 1458, 1518–19 (1986); *U.S. v. Stringfellow,* 661 F.Supp. 1053, 1062 (C.D.Cal.1987); *Artesian Water Co. v. Gov. of New Castle County,* 659 F.Supp. 1269, 1277 (D.Del.1987). I find the reasoning and analysis of *City of Philadelphia* persuasive and adopt it as the law of this case.

Assuming the equitable defense of "unclean hands" is available to Versatile Metals in this case, I find that since Versatile Metals caused and contributed to the level of the release of the hazardous substance the defense would be unavailing. In the course of their operations on the site,

Versatile Metals negligently handled the capacitors and transformers and caused leakage of the contaminated contents. Evidence of recent spills was presented. Versatile Metals failed to promptly notify the environmental authorities of the release, or Metal Bank—as required under the contract. Therefore, Versatile Metals does not appear with the requisite "clean hands" in order to invoke any "unclean hands" defense.

Section 113(f)(1) provides:

"Any person may seek contribution from any other person who is liable or potentially liable under Section 9607(a) of this title ... In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate ..."

42 U.S.C. § 9613(f)(1) (1982). Versatile Metals' claims of relative fault and innocence relate, if at all, to the apportionment of *damages,* or in determining the nature of the remedy sought. *Chemical Waste Management, Inc. v. Armstrong World Industries Inc.,* 669 F.Supp. 1285, 1292 (E.D.Pa.1987). Therefore, Versatile Metals' assertions as to relative fault will be considered in this court's apportionment of necessary response costs, if any.

### 2. *Indemnification Clause*

Versatile Metals' contends that they are not liable under CERCLA since Metal Bank agreed to indemnify Versatile Metals in the Asset Purchase and Lease Purchase Agreements if any contamination of the land occurred as a result of hazardous waste at the property on or before November 20, 1984, or the date Versatile Metals took possession. Versatile Metals further contends that Metal Bank breached express

---

**2.** Section 107(b) establishes three affirmative causation-based defenses to liability for the release of hazardous substances. A potentially "responsible person" may prove by the preponderance of the evidence that the release or threatened release was caused solely by (1) an act of God; (2) an act of war; or (3) an act or omission of a third party unrelated to the defendant, or "one whose act or omission occurs in connection with a contractual relationship,

existing directly or indirectly, with the defendant ..., if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned ... and (b) took precautions against forseeable acts or omissions of any such third party ..." 42 U.S.C. § 9607(b)(1)–(3). No contention has been put forth that the enumerated defenses are applicable in this case.

warranties in the contracts that the land and the inventory were free from contamination and that such breach precludes Metal Bank's suit.

■■■ Section 107(e) of CERCLA provides:

(e) Indemnification, hold harmless, etc., agreements or conveyances; subrogation rights

(1) No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

(2) Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

42 U.S.C. § 9607(e)(2) (1982).

CERCLA's liability provisions, therefore, do not abrogate the parties' contractual rights. *Chemical Waste Management v. Armstrong World Industries*, 669 F.Supp. 1285, 1293 (E.D.Pa.1987). A person that is liable under the terms of the Act may by agreement be held harmless or indemnified by another party. *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285, 1289 (D.Minn. 1987). 42 U.S.C. § 9607(e)(1) clearly provides that CERCLA liability is not sufficient for the recovery of costs between private parties where one such party has released the other from its CERCLA liability. *Id.* at 1290.

■■■ The indemnity clause in Section 4.05 of the Asset Purchase Agreement

serves to indemnify Versatile Metals for any costs, damages, liabilities and expenses resulting from hazardous waste in the inventory existing on and the land included in the leased premises prior to their possession. However, the indemnity clause with respect to the inventory contains certain conditions.[3] Versatile Metals was to keep all inventory purchased segregated from any other inventories. Prompt telephone notice was to be given to Metal Bank's agents upon discovery of any items in the inventory which may contain hazardous waste, and Versatile Metals was to act in a reasonable manner both before and after discovery of items containing hazardous waste in order to prevent leakage and otherwise minimize contamination or other damage.

The jury found, and this court concurs, that Versatile Metals failed to fulfill the conditions with respect to the inventory, and that this failure substantially prejudiced Metal Bank, since contamination occurred from the mishandling of the inventory and their failure to use reasonable care. Therefore, Versatile Metals cannot invoke the indemnity provisions in the contract. As the jury so found, a substantial *cause* of the contamination was Versatile Metals' failure to abide by the terms of the conditions, which do not set forth any more onerous obligations than that which Versatile Metal would have been expected to fulfill in the absence of the agreement— such as the use of reasonable care upon the discovery of hazardous waste material, and the prompt notice to Metal Bank of the alleged breach. Versatile Metals is *not* responsible for the contamination of the land that occurred before they took possession on November 20, 1984. However, Versatile Metals *is* responsible for any further contamination which occurred after November 20, 1984 due to their actions. *cf. Emhart Industries, Inc. v. Duracell International, Inc.*, 665 F.Supp. 549 (M.D.Tenn.

---

**3.** Section 4.05 of the agreement states: "Seller and Union jointly and severally agree to indemnify and hold Buyer harmless from any and all costs, damages, liabilities and expenses resulting from hazardous waste in the Inventory existing on and the land included in the leased premises at November 20, 1984, *provided that,* with respect to the *Inventory,* Buyer acts in the following manner ..."

1987). The express warranty is limited to contamination present in the land prior to Versatile Metals' possession.

## C. *Cost Recovery Under CERCLA*

Versatile Metals contends that Metal Bank's CERCLA claim must be denied because they allegedly incurred expenses that were neither necessary nor consistent with the National Contingency Plan (the NCP).

Section 107(a) provides that a responsible party shall be liable for any necessary costs of response incurred by any other person consistent with the national contingency plan. 42 U.S.C. § 9607(a)(4)(B) (1982). The amount recoverable in an action under this section shall include interest. 42 U.S.C. § 9607(a) (1982).

### 1. NOTICE

▉ Versatile Metals contends that Union failed to provide the requisite sixty-days notice pursuant to 42 U.S.C. § 9612(a), which is "necessary to maintain a private cost recovery action". Section 112(a) applies to "[a]ll claims which may be asserted against the Fund pursuant to Section 111 of this title." On October 17, 1986, President Reagan signed the Superfund Amendments and Reauthorization Act of 1986, H.R. 2005, 99th Cong., 2d Sess. (1986) U.S.Code Cong. & Admin.News 1986, p. 2835, which *inter alia,* amended Section 112(a) to make clear that its notice requirement applies only when parties intend to assert a claim against the fund.[4] *State of Idaho v. Howmet Turbine Component Co.,* 814 F.2d 1376, 1379 (9th Cir. 1987) (citing Pub.L. No. 99–499, § 112(a), 100 Stat. at 1646, to be codified at 42 U.S.C. § 9612(a) *See also* Conference Report at 219, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 3312.

4. As amended, section 112(a) now reads: Claims Procedure
(a) CLAIMS AGAINST THE FUND FOR RESPONSE COSTS.—No claim may be asserted against the Fund pursuant to section 111(a) unless such claim is presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the

Nevertheless, even if this court was not obliged to apply the recent amendment, and, applying the reasoning set forth in *State of Idaho* and *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074 (1st Cir.1986), the result is the same. Under either the new or replaced version of the statute the 60 day notice requirement is not applicable to this action where no claim has been made against the Fund.

### 2. THE APPLICABLE NCP

To recover under CERCLA, a private party must first establish that it has incurred costs "consistent with the NCP." 42 U.S.C. § 9607(a)(4)(B) (1982). A private party bears the burden of both pleading and proving consistency with the NCP. *State of N.Y. v. Shore Realty Corp.,* 648 F.Supp. 255, 262 (E.D.N.Y.1986).

In 1982 the Environmental Protection Agency (EPA) issued the National Oil and Hazardous Substance Pollution Contingency Plan (the 1982 national contingency plan), 47 Fed.Reg. 31180 *et seq.* (July 16, 1982); 40 C.F.R. §§ 300.1.86 (1985) pursuant to section 105 of CERCLA, 42 U.S.C. § 9605, and Executive Order No. 12,316,46 Fed.Reg. 42,237 (1981). One subpart of the 1982 national contingency plan addresses hazardous substance response. *See* 40 C.F.R. §§ 300.61–.71 (1985). This subpart "establishes methods and criteria for determining the approximate extent of response authorized by CERCLA when any hazardous substance is released." 40 C.F.R. § 300.61(a) (1985).

The EPA subsequently revised the 1982 Plan on November 20, 1985. *See* 50 Fed. Reg. 47911 *et seq.* (1985), 40 C.F.R. § 300.1 *et seq.* (1986).

▉ At the outset, Metal Bank contends that since the response actions on the

claimant who may be liable under section 107. In any case where the claim has not been satisfied within 60 days of presentation in accordance with this subsection, the claimant may present the claim to the Fund for payment. No claim against the Fund may be approved or certified during the pendency of an action by the claimant in court to recover costs which are the subject of the claim.

site were initiated in May of 1984, consistency with the NCP should be determined in light of the prior NCP instead of the revised version. Consistency with the NCP should be determined in light of the NCP in effect at the time the response costs were incurred, not when the response actions were initiated or when the claims for cost recovery are evaluated. *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 891 (9th Cir.1986); *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *Artesian Water Co. v. Gov. of New Castle County,* 659 F.Supp. at 1294. A review of the evidence reveals that the response costs were incurred starting May, 1984 and continued until March, 1985. All costs were incurred before the effective date of the subsequent 1985 NCP, or February 18, 1986. To the extent that the subsequently issued regulations *alter* the prior regulations, I will evaluate the response costs in light of the prior 1982 NCP. To the extent that the subsequent regulations *clarify* the prior regulations as to private party obligations, such regulations will govern.

Section 300.71 of the 1985 NCP provides:

*Other party responses.*

(a)(1) Any person may undertake a response action to reduce or eliminate the release or threat of release of hazardous substances, or pollutants or contaminants. Section 107 of CERCLA authorizes persons to recover certain response costs consistent with this Plan from responsible parties.

(2) For purposes of cost recovery under section 107 of CERCLA, except for actions taken pursuant to section 106 of CERCLA or pursuant to preauthorization under § 300.25 of this Plan, a response action will be consistent with the NCP (or for a State or Federal government response, not inconsistent with the NCP), if the person taking the response action:

(i) Where the action is a removal action, acts in circumstances warranting removal and implements removal action consistent with § 300.65.

(ii) Where the action is a remedial action:

(A) Provides for appropriate site investigation and analysis of remedial alternatives as required under § 300.68;

(B) Complies with the provisions of paragraphs (e) through (i) of § 300.68;

(C) Selects a cost-effective response; and

(D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless compliance with the legally applicable or relevant and appropriate State and local requirements identified under paragraph (4) of this section provides a substantially equivalent opportunity for public involvement in the choice of a remedy.

(3) For the purpose of consistency with § 300.65 and § 300.68 of this Plan, except for response actions taken pursuant to section 106 of CERCLA or response actions for which reimbursement from the Fund will be sought, any action to be taken by the "lead agency" in § 300.65 or § 300.68 may be taken by the person carrying out the response.

(4) Persons performing response actions that are neither Fund-financed nor pursuant to action under section 106 of CERCLA shall comply with all otherwise legally applicable or relevant and appropriate Federal, State and local requirements, including permit requirements.

50 Fed.Reg. 47912 (Nov. 20, 1985), to be codified at 40 C.F.R. § 300.71.

The prior NCP did not contain a separate provision which addressed the obligations of private parties in clean-up actions. Instead, private parties have been expected to comport private clean-ups with the requirements for all response actions.

The statute does not define "necessary costs of response" but does provide that "response" means "remove, removal, remedy and remedial action ... includ[ing] enforcement activities related thereto." 42 U.S.C. § 9601(25) (1982). "Remove" and "removal" are defined as:

The cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of

hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes in addition, without being limited to, security fencing, or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of individuals not otherwise provided for, action taken under section 104(b) of this Act, and any emergency assistance which may be provided under the Disaster Relief Act of 1974.

42 U.S.C. § 9601(24) (1982). "Remedy" and "remedial action" are defined as meaning:

[T]hose actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or to the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, clean-up of released hazardous substances or contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and run-off, on-site treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment ...

42 U.S.C. § 9601(24) (1982). It has been established that "removal" actions are primarily those intended for short-term clean-up arrangements and interim responses. "Remedial" actions are generally considered long-term or permanent remedies. *T & E Indus. Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 706 (D.N.J.1988); *State of N.Y. v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir.1985); *City of New York v. Exxon Corp.*, 633 F.Supp. 609, 614 (S.D.N.Y.1986). Removals are generally not to be used as long-term solutions. *See* Section III, Preamble, 50 Fed.Reg. at 47,930. Removal and remedial actions may supplement each other or overlap. *See id.* The distinction between remedial and removal actions is crucial in certain cases where the failure to fulfill the more detailed procedural and substantive provisions of the NCP with regard to "remedial" actions becomes a barrier to recovery of response costs.

The revised NCP altered the general scheme of the 1982 NCP in relation to remedial and removal actions. The 1982 Plan listed steps in response actions in terms of phases. After Phase III, or immediate removal, there is Phase IV, which provides for the evaluation and determination of appropriate responses for planned removal and remedial action. A planned removal is essentially a continuation of the initial removal action, after a preliminary assessment for remedial action is performed. *See* 40 C.F.R. § 300.66 and § 300.67. Phase VI contains the procedures for performing a remedial action.

The revised regulations eliminate the distinction between immediate and planned removals, establishing a single standard for authorizing all removals. The EPA noted that by incorporating planned removals into the general category of removals, the intent was not to substantially increase removal actions. Removal actions are those necessary to prevent, minimize, or mitigate damage to the public health or welfare or the environment and are generally not to be used as long-term solutions. *See* Section III of the Preamble discussing revisions to Subpart F of the NCP, 50 Fed.Reg. at 47,930 (1985). I find, therefore, that planned removals are essentially the same as "removals" as incorporated in the newly

revised regulations, and will apply the new revisions as such.

■ Section 300.68 of the 1985 Plan relating to remedial actions is a clarification of Phase VI of the 1982 Plan with one exception. The 1985 Plan added a provision requiring an opportunity for appropriate public comment concerning the selection of a remedial action. Since this provision clearly was not required under the 1982 NCP in effect at the time defendants incurred response costs, the failure of defendants to provide such opportunity will not pose a bar to recovery.

### 3. *Remedial and Removal Actions*

■ Versatile Metals contends that defendants are barred from relief since they failed to prove that their response actions, which were remedial in nature, were consistent with the NCP. Metal Bank claims that their response action was one of removal so they were not obligated to fulfill the more thorough procedures relating to remedial actions.

According to the NCP, a removal action is appropriate where it is determined that there is a threat to public health or welfare or the environment. Removal actions are not subject to the lengthy procedural requirements of the NCP since they are taken in response to an immediate threat. Factors to be considered in determining the appropriateness of a removal action include:

(i) Actual or potential exposure to hazardous substances ... by nearby populations, animals, or food chain;

(ii) actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iii) hazardous substances ... in drums, barrels, tanks, or other bulk storage containers, that may pose a threat of release;

(iv) high levels of hazardous substances ... in soils largely at or near the surface, that may migrate;

(v) Weather conditions that may cause hazardous substances ... to migrate or be release;

(vi) threat of fire or explosion;

(vii) other situations or factors which may pose threats to public health or welfare or to the environment.[5]

40 C.F.R. § 300.65(b)(2).

Removal actions are short-term, immediate response actions, and are limited to situations which pass the "threshold" for removal actions as determined by an examination of the above-mentioned factors in § 300.65(b)(2). *See* 50 Fed.Reg. 47,930 (1985). Actions taken in a proper removal action are limited in scope to address the immediate threat, and include those designed to abate, minimize, stabilize mitigate, or eliminate the release or threat of release. *See* 50 Fed.Reg. 47,971 (1985); 40 C.F.R. § 300.65(b)(1).

Where immediate removal action is appropriate, the revised NCP states that the following removal actions are, as a general rule, appropriate:

(1) Fences and warning signs, or other security or site control precautions—where humans or animals have access to the release;

(2) Drainage controls (e.g., run-off or run-on diversion)—where precipitation or run-off from other sources (e.g., flooding) may enter the release area from other areas;

(3) Stabilization of berms, dikes, or impoundments—where needed to maintain the integrity of the structures;

(4) Capping of contaminated soils or sludges—where needed to reduce migration of hazardous substances ... into soil, ground water, or air;

(5) Using chemicals and other materials to retard the spread of the release or to mitigate its effects—where the use of such chemicals will reduce the spread of the release;

(6) Removal of highly contaminated soils from drainage or other areas—where removal will reduce the spread of contamination;

---

**5.** Private parties are exempt from subsection vii of this section.

(7) Removal of drums, barrels, tanks, or other bulk containers that contain or may contain hazardous substances ...— where it will reduce the likelihood of spillage; leakage, exposure to animals or food chain, or fire or explosion;

(8) Provision of alternative water supply —where it will reduce the likelihood of exposure of humans or animals to contaminated water.

50 Fed.Reg. 47,971 (1985); 40 C.F.R. §§ 300.65(c)(1)(8).

The evidence adduced at trial shows that at the time the response action was started, there was probable widespread contamination of the site. After a brief preliminary assessment, the defendants took certain immediate steps to control any further migration of the contaminants into the soil and drainage system and to protect employees on the site. The immediate steps taken included securing the site and stopping the exit from the site of anything not certified as clean. Workers were instructed to leave the area. An access fence was constructed. Hay bales were installed around drains that were draining contaminated storm water.

At the same time, the defendants adopted a long-term and permanent strategy for the clean-up. Defendants decided to proceed as if the entire site was contaminated and clean areas from the outside edges into the center of the site. The center would be cleaned out last since defendants' information showed that it was the area containing the highest concentration of contaminants. (Testimony of Dr. Kleppinger, N.T. 24–91). An asphalt cover was used to establish a clean area.[6]

Two months after the response action was initiated, garages were cleaned out to make space to store materials. Employees were educated on PCBs. A "clean area" was established for employees. Decontamination facilities were planned and started. After two months defendants were "ready to attack it" (N.T. 24–92) Employees were hired. The medical monitoring program was instituted. A supervisor was hired. Materials were pulled out, cleaned and certified. The facility was cleaned starting at a corner. Materials were dismantled and cleaned as they were pushed to the center.

The damaged capacitors on the site were left alone until they were ready to be moved. Equipment and materials were cleaned. If the equipment could be salvaged for sale, it was taken out. If it was scrap, it was cleaned and put into a dumpster. If it was suspected of being contaminated, it was shoved towards the center.

Capacitors were identified, removed separately from the pile, transported to the storage area for PCB materials and kept there until they were loaded into appropriate containers and arrange for shipment and destruction. A log was kept to record each capacitor and its location. Equipment and materials were cleaned with high pressure steam and water.

Based on the evidence presented at trial, I find that although some immediate actions were taken at the time the contamination was discovered, defendants' response action was remedial. Dr. Kleppinger, defendants' expert and consultant on the clean-up action, testified himself that the response action was and was intended to be one of permanent remediation.

Dr. Kleppinger testified that after the immediate "problems" were handled at the site, the remedial strategy was formulated:

In terms of the *remedial* strategy for the site, there are two ways to go with any of these sites. One is that you spend a lot of time and money taking samples to determine what is clean and what the dirt. Then, once you got that done, then you decide how you are going to clean it up. I don't personally care for that approach, although it is appropriate in some circumstances. My only approach in this case was to simply say, for *remedial* purposes, the entire site is contaminated—we will assume the entire site is contaminated and we will clean it

---

**6.** Although such a "cap" could be considered an appropriate removal action as provided in § 300.65(c)(4) if it is employed to abate the migration of contaminants, in this case the soil was capped in order to be a *permanent* cover.

up as if it was contaiminated. The only other decision you have to make is to decide whether you are going to attempt to get a remedial plan that removes all the contamination from the site or whether you leave contamination in place, but in a fashion that does not present a threat to public health and the environment and we chose the latter course in this case and that is, it was planned to leave the site with PCB contamination remaining, but secured. (emphasis added)

Further, at no time throughout the trial did defendants prove that a removal rather than a remedial action was appropriate given the circumstances at the site and according to the factors to be considered under § 300.65(b)(2). Therefore, the bulk of defendants' response actions must be shown to have been consistent with the NCP as it applies to remedial actions.

### 4. *Consistency with the NCP*

Where the action is a *remedial* action, a private party response action will be consistent with the NCP if the person taking the response action:

(A) Provides for appropriate site investigation and analysis of remedial alternative as required under § 300.68;

(B) Complies with the provisions of paragraphs (e) through (i) of § 300.68;

(C) Selects a cost-effective response; and

(D) Provides an opportunity for appropriate public comment concerning the selection of a remedial action consistent with paragraph (d) of § 300.67 unless compliance with the legally applicable or relevant and appropriate State and local requirements identified under paragraph (4) of this section provides a substantially equivalent opportunity for public involvement in the choice of remedy.

As stated in the *Preamble* to the revised NCP:

The most important factor of any response action is the ultimate level of cleanup to be achieved at a site. For remedial actions, the most important factors that contribute to the final selection of a remedy are the scoping of response actions, the development of alternatives, and the detailed analysis of alternatives during the RI/FS. To be consistent with the NCP for the purpose of cost recovery under section 107 of CERCLA, non-Fund-financed responses *must,* as appropriate, address the full range of alternatives outlined in § 300.68(f), as well as comply with all other provisions of §§ 300.66(e) through (i). Such responses also must provide an opportunity for appropriate public comment.[7] This public involvement must be consistent with § 300.67(d) unless compliance with the legally applicable or relevant and appropriate State and local requirements identified in § 300.71(a)(4) provide a substantially equivalent opportunity for public involvement in the choice of remedy. Finally, such responses must also comply with all otherwise applicable or relevant and appropriate Federal, State, and local requirements.

50 Fed.Reg. 47,935 (1985)

Section 300.68(d) describes the necessary study:

(d) Remedial Investiation/Feasibility Study (RI/FS). An RT/FS shall, as appropriate, be undertaken by the lead agency conducting the remedial action to determine the nature and extent of the threat presented by the release and to evaluate proposed remedies. This includes sampling, monitoring, and exposure asessment, as necessary, and includes the gathering of sufficient information to determine the necesity for and proposed extent of remedial action. Part of the RI/FS may involve assessing whether the threat can be prevented or minimized by controlling the source of the contamination at or near the area where the hazardous substances were originally located (source control measures) and/or whether additional actions will be necessary because the hazardous substances have migrated from the area

---

**7.** As stated previously in this memorandum, I will not apply the requirement of providing an opportunity for appropriate public comment since this was clearly not required when the defendants incurred the response costs.

of or near their original location (management of migration). Planning for remedial action at these releases shall, as appropriate also assess the need for removals. During the remedial investigaiton, the original scoping of the project may be modified based on the factors in § 300.68(e).

Section 300.68(e) provides:

(e) Scoping of Response Actions during the Remedial Investigation (1) The lead agency, in cooperation with the State(s), will examine available information and determine, based on the factors indicated in paragraph (e)(2) of this section, the type of response that may be needed to remedy the release. This scoping will serve as a basis for requesting funding for a necessary removal action and may serve as the basis for further supporting funding requestins for a remedial investigation or feasibility study. Initial analysis shall indicate the extent to which the release or threat of release may pose a threat to public health or welfare of the environment, indicate the types of removal measures and/or remedial measures suitable to abate the threat, and set priorities for implementation of the measures. Initial analysis shall, as appropriate, also provide a preliminary determination of the extent to which Federal environmental and public health requirements are applicable or relevant and appropriate to the specific site and the extent to which other Federal criteria, advisories, and guidance and State standards are to be used in developing the remedy.

50 Fed.Reg. 47,974, 40 C.F.R. § 300–68(e)(2). To determine whether and what type of remedial and/or removal actions are appropriate, a party must consider:

(i) Population, environmental and welfare concerns at risk;

(ii) Routes of exposure;

(iii) Amount, concentration, hazardous properties, environmental fate and transport (e.g., ability and opportunities to bioaccumulate, persistence, mobility, etc.), and form of the substance(s) present;

(iv) Hydrogeological factors (e.g. soil permeability, depth to saturated zone, hydrologic gradients, proximity to a drinking water aquifer, floodplains and wetlands proximity);

(v) Current and potential ground water use (e.g., the appropriate ground water classes under the system established in the EPA Ground–Water Protection Strategy);

(vi) Climate (rainfall, etc.);

(vii) The extent to which the source can be adequately identified and characterized;

(viii) Whether substances at the site may be reused or recycled;

(ix) The likelihood of future releases if the substances remain on-site;

(x) The extent to which natural or manmade barriers currently contain the substances and the adequacy of the barriers;

(xi) The extent to which the substances have migrated or are expected to migrate from the area of their original location, or new location if relocated, and whether future migration may pose a threat to public health welfare or the environment;

(xii) The extent to which Federal environmental and public health requirements are applicable or relevant and appropriate to the specific site, and the extent to which other Federal criteria, advisories, and guidance and State standards are to be considered in developing the remedy;

(xiii) The extent to which contamination levels exceed applicable or relevant and appropriate Federal requirements or other Federal criteria, advisories, and guidance and State standards;

(xiv) Contribution of the contamination to an air, land, water, and/or food chain contamination problem;

(xv) Ability of responsible party to implement and maintain the remedy until the threat is permanently abated:

(xvi) For Fund-financed responses, the availability of other appropriate Federal or State response and enforcement mechanisms to respond to the release; and

(xvii) Other appropriate matters may be considered.

(3) As a remedial investigation progresses, the project may be modified if the lead agency determines that, based on the factors in § 300.68(e)(2), such modifications would be appropriate.

50 Fed.Reg. 47,974; 40 C.F.R. § 300.68(e)(2).

The next step is the development of alternative actions.

(f) Development of Alternatives (1) To the extent that it is both possible and appropriate, at least one remedial alternative shall be developed as part of the feasibility study (FS) in each of the following categories:

(i) Alternatives for treatment or disposal at an off-site facility, as appropriate;

(ii) Alternatives that attain applicable or relevant and appropriate Federal public health and environmental requirements;

(iii) As appropriate, alternatives that exceed applicable or relevant and appropriate Federal public health and environmental requirements;

(iv) As appropriate, alternatives that do not attain applicable or relevant and appropriate Federal public health and environmental requirements but will reduce the likelihood of present or future threat from the hazardous substances and that provide significant protection to public health and welfare and the environment. This must include an alternative that closely approaches the level of protection provided by the applicable or relevant and appropriate requirements;

(v) No action alternative.

50 Fed.Reg. 47,974; 40 C.F.R. § 300.6(f)

A party then conducts an initial screening of the developed alternatives taking into account cost, acceptable engineering practices and effectiveness. Section 300.-68(g). After the more detailed analysis of the remaining alternatives is conducted, according to Section 300.68(h), a remedy is ultimately selected according to the relevant factors provided in 300.68(i).

*Defendant's Remedial Action*

▆▆ Defendants hired Dr. Kleppinger, a consultant, to formulate the basic strategy for the clean-up. After a brief assessment, Dr. Kleppinger advised that it was best to assume the entire site was contaminated and to proceed accordingly. By the defendants' own admission, no assessment of the site came remotely close to what is required for an adequate investigation or feasibility study for remedial purposes under the NCP. Indeed, from the testimony adduced, defendants' made a deliberate decision *not* to perform the required study since it would be too expensive and time-consuming.[8]

---

**8.** As stated by Dr. Kleppinger:

"In some cases, the testing, particularly on sites that are on the National Priorities List under Superfund, the actual testing and remedial investigation can take an average of about two million dollars and several years worth of time so if you judge that the site doesn't need that kind of extensive approach, if it is not on the NPL, for example, then you can short circuit that and do a much more economical clean-up and still achieve the same standards of public health protection and environmental protection." (N.T. 25–4)

Q. In terms of the time and the cost involved, what was the difference in your opinion, between taking the approach that you did and taking an approach that would have required extensive testing and analysis before you began to do any work?

A. Well, I think we saved at least a year, if not two to three years worth of time in terms of affecting the remediation and probably saved well over a million dollars totally. Perhaps more. (N.T.25–6).

Also, Dr. Kleppinger testified as to his interpretation of the NCP:

Q. Did you take into account the provisions of the National Contingency Plan in developing your remediation of this site?

A. Yes, sir.

Q. Could you describe in general how you did that?

A. Well, the NCP says first of all, you got to report if you have a problem if you got a spill.

Interestingly enough, it requires that the operators of the site report, in this case, I believe that Metal Bank reported, I saw that and was done before my retention, but I saw the notice.

Then it says, once you report, you contain the spill, you keep it from leaving the site. That sort of thing.

You take immediate emergency response actions and then in general, the screen is, once you have gotten the immediate emergency response from immediate actions taken place, that you do what is called remedial investigation feasibility study, which can be anywhere from, what I did, which is basically looking at the site

The lack of a proper feasibility study also affects defendants' ability to meet their burden of proof as to the other necessary elements of a cost-recovery claim. Since no alternatives to the remedial action were formally investigated by the defendants, no showing has been made of the relative cost-effectiveness of the response or the necessity of the costs incurred as required by Section 300.71(a)(2)(ii)(c). This court cannot base a determination of the efficacy of the remedial actions in a vacuum. For example, defendants have not shown that the capping of highly PCB contaminated soil was necessary, proper, or cost-efficient as opposed to other methods which possibly could have removed the contaminants permanently.[9]

The court notes that no off-site testing was performed even though Metal Bank's expert noted that the conditions on the site, such as contaminated water discharging into storm sewer and the wind blowing dust which was causing PCBs to leave the site, suggested that some off-site migration of contamination was occurring. (N.T. 27/193–194). The extent of Metal Bank's investigations as to off-site migration was for the consultant, Dr. Kleppinger, to walk the edges of the site to make sure there was no run-off and put hay bales around the storm sewers, even though he testified that believed that he would expect to see significant off-site contamination. (27–193–195).[10]

Therefore, I find that the defendants have failed to prove by a preponderance of the evidence that the remedial action taken in response to the contamination of the site was consistent with the NCP and cost-effective as promulgated at the time the response costs were incurred and contribution for these remedial costs are disallowed. The court notes that defendants are not without relief in this matter. Defendants prevailed on their pendent state law claim of waste which entitles them to relief in the form of reimbursement for the costs of the clean-up attributable to plaintiffs' actions. As stated in *Artesian Water Co. v. Gov. of New Castle County*, 659 F.Supp. at 1299, there is a difference between an action for response costs under CERCLA and an action for damages in tort:

"Limiting recovery of the costs ... ensures that responsible parties will be liable under CERCLA only of the necessary costs of response.... Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions. Unless Congress sees fit to provide such a remedy, full compensation for hazardous waste harms will in most

and saying, it's obvious here are the two ways that this site can be handled. We will do it one way or the other. Recommend a way to rather formalized studies that occupied you know, six foot of shelf volume and four years of consultant's time to prepare.

So again, each site is unique and you deal with each one in a unique fashion but in general, there are a series of steps that you go through. Sometimes very abbreviated; other times rather lengthy. (N.T. 25/49–50)

9. The soil sampling tests conducted after the capping of the soil with asphalt reveals that the soil below the cap is still substantially contaminated, or contains areas of soil with PCB concentrations well in excess of 50 ppm. (*See* Plaintiff's exhibit 55(h) the test results of soil samples taken from the site by Woodward–Clyde consultants after the remedial plan was completed, and the test results reported by Versar Laboratories). This suggests to the court that the response actions were not entirely effective, and may fail to comply with section 300.-

71(a)(4) which mandates compliance with all otherwise legally applicable or relevant and appropriate Federal, State and local requirements.

Relevant and appropriate requirements are those that, while not "applicable," are designed to apply to problems sufficiently similar to those encountered at CERCLA sites or those that may "inapplicable" only because of jurisdictional prerequisites associated with the requirement. *See Preamble,* 50 Fed.Reg. 47947. Potentially applicable or relevant and appropriate requirements include the provisions of the Toxic Substances Control Act, 15 U.S.C. § 2601 (TSCA). The parties dispute whether the provisions of TSCA relating to PCB's create affirmative obligations and standards as to the *clean-up* of PCB's as opposed to their *disposal.* Since I have found that the defendants' remedial plan is deficient on other grounds, there is no need to address this issue.

10. A preliminary assessment of releases from hazardous waste facilities may include a perimeter (off-site) inspection. Section 300.64(b).

instances remain the province of state law."

*Artesian Water Co. v. Gov. of New Castle County*, 659 F.Supp. at 1299–1300. Judgement will be entered in favor of Versatile Metals, Inc. and Versatile Oxide, Inc. and against The Union Corporation and The Metal Bank of America, Inc. on defendants' CERCLA claim.

An appropriate order follows.

### ORDER

AND NOW, this 15th day of June, 1988, it is hereby ORDERED that:

1. Judgment is entered in favor of defendants The Union Corporation and the Metal Bank of America and against plaintiffs Versatile Metals, Inc. and Versatile Oxide, Inc. in the amount of $1,107,489.

2. A new trial is ORDERED solely to determine the amount of net monies received by defendants The Union Corporation and The Metal Bank of America on the resale of equipment allegedly owned by plaintiffs The Versatile Metals, Inc. and Versatile Oxide, Inc., if any.

3. The motion of defendants The Union Corporation and the Metal Bank of America for delay damages pursuant to Rule 238 of the Pennsylvania Rules of Civil Procedure is DENIED.

4. Judgment is entered in favor of plaintiffs Versatile Metals, Inc. and Versatile Oxide, Inc. and against defendants the Union Corporation and the Metal Bank of America on defendants' counterclaim under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9607.